JOHN LYNN STEPHENSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12543–80.    Filed December 13, 1982.

*Michael G. Parham*, for the petitioner.
*F. Michael Kovach, Jr.*, for the respondent.

OPINION

WHITAKER, *Judge*: Respondent determined the following deficiencies and additions to the tax for petitioner for the years 1976 and 1977:

|  |  | Additions to the tax | | |
| --- | --- | --- | --- | --- |
| Year | Deficiency | Sec. 6651(a)[1] | Sec. 6653(a) | Sec. 6654 |
| 1976 | $21,625.35 | 0 | $1,081.27 | 0 |
| 1977 | 53,451.70 | $13,362.92 | 2,672.59 | $1,902 |

In the amended answer, respondent raises the claim that petitioner is liable for section 6653(b) additions to the tax for fraud during both the years in issue.

The primary issue for decision is whether petitioner is relieved from income tax liability for the years in issue because of his association with the Life Science Church of

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended.

Allegan (hereinafter the church). If the answer to this question is in the negative, we must decide additionally the following issues:

(1) Is petitioner entitled to any charitable deductions?

(2) Did petitioner realize gain in 1977 on the sale of his residence, and, if so, does section 1034 allow such gain not to be recognized?

(3) Is petitioner entitled to personal exemption deductions with respect to his wife and two children?

(4) Is petitioner liable for the section 6654 addition to the tax in 1977 for failure to pay estimated income tax?

(5) Is petitioner liable for the section 6653(b) addition to the tax for fraud for both 1976 and 1977, or alternatively, the section 6651(a) addition to the tax for 1977 and the section 6653(a) addition to the tax for both 1976 and 1977?

Some of the facts have been stipulated and are so found. For convenience, the findings of fact and opinion have been combined.

The petition alleges that petitioner resided in Chelsea, Mich., when the petition in this case was filed.

### *Effect of "Church" Upon Petitioner's Tax Liability*

In late 1976, petitioner traveled to Elkhart, Ind., to attend a meeting at which Peter Beaumont and William Drexler spoke about the Life Science Church and its beliefs. After attending this meeting, petitioner paid $500 by check dated December 30, 1976, to the Life Science Church. He was thereafter ordained as a "minister" of the Life Science Church and given preprinted documents to use in organizing his "church."

Petitioner executed a charter for his "church" on one of the forms provided by the Life Science Church. The charter was dated December 30, 1976, and signed by William Drexler as bishop and dean of Life Science College and by petitioner, his wife, and another individual as trustees of the newly formed "church." He also executed a vow of poverty, dated December 30, 1976, which stated that all his possessions and income were the property of the "church" regardless of whether they continued to appear in his name and that "Outside employment renumberation [sic] (when directed by the church or order) is not personal income, but rather income/gift to the church/order." Petitioner and his wife also executed a quit-

claim deed to transfer their residence in Allegan, Mich., to petitioner as trustee for the "church," in return for stated consideration of $1. This deed was dated March 16, 1977, and recorded by the Register of Deeds on March 18, 1977.

Petitioner worked during the years in issue as a physician, first as an employee of the Allegan Medical Clinic, P.C. (hereinafter the clinic), and later as an independent contractor with Chelsea Emergency Physicians, P.C. (hereinafter Chelsea Physicians). The clinic paid petitioner wages of $50,692.25 in 1976 and $32,302.65 in 1977, and made out Forms W–2 showing these amounts. Chelsea Physicians paid petitioner a total of $44,151.90 during 1977. These payments were by checks made payable to "John L. Stephenson, M.D." Also during 1977, petitioner received a $10,602.99 check as a distribution from the profit-sharing plan of the clinic. This check was made payable to John L. Stephenson, individually, and he cashed it in that capacity. During 1978, he received a Form 1099R informing him that this distribution was ordinary income to him during 1977.

Petitioner's Federal income tax return for the taxable year 1976, which was filed on or about April 15, 1977, listed his filing status as "single" and specified his occupation as a "member of religious order." He reported as income his wages of $50,692.25 from the clinic, and subtracted this same amount as an adjustment to gross income, resulting in adjusted gross income of zero. He did not fill out part II of the return to explain the adjustment to income. Attached to the return was a copy of the vow of poverty and a Form 4029, "Application for Exemption From Tax on Self-Employment Income and Waiver of Benefits," dated December 30, 1976. The Form 4029 stated that he was—

conscientiously opposed to acceptance of the benefits of any private or public insurance which makes payments in the event of death, disability, old-age, or retirement or makes payments toward the cost of, or provides services for, medical care * * *

For the year 1977, petitioner filed no Federal income tax return.

On January 1, 1977, petitioner executed and submitted to the clinic a Form W–4E, "Exemption From Withholding," certifying that he incurred no Federal income tax liability for 1976 and anticipated incurring no liability for 1977. He also

executed and submitted a similar withholding exemption certificate for Michigan State income taxes. Because of the clinic's concern for the legality of its stopping the withholding of income and FICA taxes from petitioner's wages, it consulted its attorney, who drew up a memorandum of understanding. In this memorandum, which was dated January 2, 1977, petitioner agreed to indemnify the clinic for any liability and expenses resulting from its acquiescence in his request that they terminate withholding taxes from his pay checks.

In the latter part of March 1977, petitioner resigned from the clinic and contracted with Chelsea Physicians to work for them on an independent contractor basis. He entered into a memorandum of understanding with Chelsea Physicians dated March 30, 1977, which stated:

the Corporation does not agree with or support directly or indirectly [petitioner's] personal activities relating to his own philosophy on government policies or programs nor his personal religious practices. While the Corporation does respect the Doctors [sic] First Amendment rights, Doctor agrees not to promote the previously mentioned activities within the Corporation's service area and to refrain from any activity which may create an unfavorable impression or be cause of embarrassment for the Corporation in its service area.

From approximately April 21, 1973, through November 16, 1977, petitioner and his wife maintained a personal checking account with the American National Bank, Allegan, Mich. Many of their personal living expenses, such as payments for mortgage, insurance, home improvements, and repairs, were made by checks drawn from this account. On March 19, 1977, petitioner opened with the same bank a checking account in the name of Life Science Church of Allegan, with himself and his wife named as the sole trustees and signatories on the account. After this "church" account was opened, petitioner rarely used his personal account. Rather, he deposited his earnings in the "church" account, and drew checks on it to pay the same types of expenses, such as mortgage and insurance payments, that had previously been paid from his personal account. For instance, prior to March 19, 1977, petitioner used his personal account to make mortgage payments of $204 per month on his Allegan residence; after he opened the "church" account, he used it as the source for all the mortgage payments. Furthermore, after he sold the Allegan residence,

the approximately $48,000 of sale proceeds were deposited in the "church" account, and shortly thereafter, he drew a check on the "church" account for $59,000, which was used to purchase the Chelsea residence. Title to the Chelsea residence was in the name of petitioner and his wife, not the "church."

The first question which we must answer is whether income was earned by petitioner, individually, during the years in issue. Petitioner claims, in essence, that amounts paid to him by his employers should be excluded from his income because they were paid to him as an agent of the "church."

The year 1976 can be quickly disposed of because documentary evidence indicates petitioner never created any "church" in that year. Petitioner testified that he was ordained and created the "church" on December 30, 1976, after he "contributed" a $500 check to William Drexler of the Life Science Church. Respondent contends that the check was actually written in late February or early March 1977, but was backdated to December 30, 1976, and that the documents creating the "church" were also not executed until the later date. The checks used by petitioner and his wife were numbered sequentially, with checks bearing numbers below 1468 having been written in 1976. The check petitioner made out to the Life Science Church was number 1532. On the back of the check, February 26, 1977, is stamped as the date of deposit to the Life Science Church account. The check was reported on petitioner's bank statement as paid on March 2, 1977. Check number 1515 was dated February 11, 1977, and check number 1547 was dated March 16, 1977. This evidence unmistakably points to the conclusion that petitioner never made any "contribution" to the Life Science Church in 1976 and that he did not set up his "church" in that year. Instead, he made out his $500 check in mid- or late February of 1977, and then received a packet of documents to be used in establishing a purportedly tax-exempt church.[2] Since the purported "church" was not set up until early 1977, there is no

---

[2]Consistent with this finding that the check was not made out until mid- or late February 1977 is that the quitclaim deed of his residence was dated Mar. 16, 1977, and that the "church" account was opened on Mar. 19, 1977. The charter was dated Dec. 30, 1976, but this, too, appears to have been backdated since it was not recorded until July 12, 1977.

basis whatsoever for seeing petitioner as an agent of a church or religious order in 1976.

With respect to the year 1977, we believe that petitioner's unfettered ability to use all property and funds purportedly transferred to the "church," combined with the nature and activities of the "church," establishes that the "church" was not a separate and distinct principal. *McGahen v. Commissioner*, 76 T.C. 468, 479 (1981), on appeal (3d Cir., Aug. 24, 1981).[3] The charter stated that no part of the "church's" earnings should inure to the benefit of private individuals, and petitioner testified that under the vow of poverty, he had given up all his possessions after becoming a minister. However, petitioner freely withdrew funds from the "church" account to pay personal living expenses, and the amounts withdrawn by petitioner were in no way related to any services he might have performed for the "church." Indeed, he used $59,000 withdrawn from the "church" account to purchase his Chelsea residence, which was recorded as owned by him jointly with his wife and not by the "church."

What occurred here is simply that petitioner deposited all his wages and other amounts he received to the "church" account. Petitioner's testimony shows that the "church" had no congregation, no members other than petitioner and his wife, no regular worship services, and no liturgy, and that petitioner never performed any type of sacramental services. Petitioner received at most only a limited instruction in the beliefs of the Life Science Church, which according to his testimony are simply that the Constitution of the United States and the Declaration of Independence are divinely inspired; that there is a creator; and that if the nation and the world follow what the creator has inspired to be written, this country will continue in prosperity, and evil will not prevail. Petitioner's ministerial role had no effect upon his lifestyle since he had no activities of a ministerial type to perform. He continued to practice medicine just as he had before his ordination. He tried to characterize his medical practice as a "good anti-evil activity," which could be an example for other people to follow, but his testimony as to any charitable medical

---

[3]See also *Young v. Commissioner*, T.C. Memo. 1981-109; *Lynch v. Commissioner*, T.C. Memo. 1980-464.

services for nonpaying patients is unconvincing. As in *McGahen v. Commissioner, supra* at 480, the "church," by its very nature, merges the secular with the sacerdotal and must be seen as an impermissible attempt "to transmute the commercial into the ecclesiastical and thus avoid the congressional separation of taxable individual income and tax-exempt religious order income."

Since the "church" is not a separate entity, there is obviously no agent-principal relationship. Thus, petitioner is not sheltered from taxation by his claim that he received the amounts in issue as an agent of the "church." Nonetheless, he would be entitled to exclude the amounts in issue if he could show they were paid to him as an agent of the Life Science Church, the parent church, rather than in his individual capacity. In this respect, petitioner introduced a form letter from the Life Science Church signed by the Rev. Bill Drexler, stating that petitioner was to use his occupation as a medical doctor to carry out and put into effect the principles of the Life Science Church and to earn income to support himself and his family as a vehicle to carry out the purposes of the Life Science Church. The letter also stated that he was to use the income as he saw fit and reasonable to carry out the purposes of the Life Science Church. The Life Science Church never negotiated with petitioner's employers or exercised any control over the conduct of his activities as a physician, if indeed it had any awareness of them. The clinic's contract with petitioner was entered into on July 1, 1976, long before petitioner claimed he became an agent of the Life Science Church. Although the memorandum of understanding between petitioner and the clinic was executed after his signing the vow of poverty, this memorandum clearly did not contemplate any alteration of the employment arrangement; all it was designed to do was to protect the clinic from any liability that might result from its not withholding taxes on salary paid to petitioner in his individual capacity. In this context, it is indisputable that the clinic did not employ petitioner as an agent of any church or religious order. It is also clear that Chelsea Physicians contracted with petitioner for his medical skills as an individual and not as an agent of a church or religious order. Indeed, the memorandum of understanding between Chelsea Physicians and petitioner specifically prohibited petitioner from

promoting his personal philosophy or religious practices while working for them. Furthermore, the Life Science Church did not, itself, receive petitioner's earnings. All the checks were paid individually to petitioner, and he had complete freedom to do with them as he chose. On these facts, petitioner was clearly not an agent of the Life Science Church for tax purposes. See *Kelley v. Commissioner*, 62 T.C. 131 (1974).[4]

## Charitable Contributions

The next question, which automatically follows, is whether petitioner can take a charitable deduction for amounts turned over to the "church." To get a charitable deduction, petitioner must prove that the recipient organization qualified under section 170(c)(2). For a church to so qualify it must meet the section 501(c)(3) organizational and operational tests,[5] neither of which is satisfied here.[6]

Petitioner's "church" cannot satisfy the organizational test because paragraph 16 of the charter provided for the assets of the "church" to be returned to the donor upon dissolution of the "church" if there was a dispute among the board of trustees as to how to dispose of the assets. Since petitioner was one of the trustees, he could assure that the assets would be returned to him on dissolution. Such control over the ultimate disposition of the "church's" assets establishes that it was not organized exclusively for an exempt purpose. See sec. 1.501(c)(3)–1(b)(4), Income Tax Regs.; *Calvin K. of Oakknoll v. Commissioner*, 69 T.C. 770 (1978), affd. per unpublished order 603 F.2d 211 (2d Cir. 1979).[7]

With respect to the operational test, section 1.501(c)(3)–

---

[4]See also *Minckler v. Commissioner*, T.C. Memo. 1981–343.

[5]Sec. 1.501(c)(3)–1(a)(1), Income Tax Regs.

[6]No evidence was introduced as to whether the parent church, the Life Science Church, has been recognized as tax exempt. We note that even if petitioner had shown the parent church to be exempt, it would not necessarily follow that the "church" he created would also enjoy this exemption simply by virtue of having been chartered by the parent church. Like the charter of the purported church considered in *McGahen v. Commissioner*, 76 T.C. 468, 481 (1981), on appeal (3d Cir., Aug. 24, 1981), the "church's" charter provided that no property of the "church" belongs to the parent church and that "it is not under the management, direction or control of the parent church." See also *Basic Bible Church v. Commissioner*, 74 T.C. 846, 855–856 (1980).

[7]See also *Pusch v. Commissioner*, T.C. Memo. 1980–4, affd. per unpublished order 628 F.2d 1353 (5th Cir. 1980).

1(c)(2), Income Tax Regs., provides that an organization is not operated exclusively for exempt purposes if its net earnings inure in whole or in part to the benefit of private individuals. This prohibition of inurement is set forth in the statute itself. In declining to find petitioner to be an agent of the "church," we stressed that he used the "church" account just as if it were his personal checking account and that his ordination had no effect on his lifestyle. Because of this free access to funds in the "church" account, it is obvious that any earnings of the "church" inured to petitioner's benefit (*McGahen v. Commissioner, supra* at 482–483), and that the "church" does not meet the operational test of section 501(c)(3). *Basic Bible Church v. Commissioner*, 74 T.C. 846, 857–858 (1980).[8] Because the "church" is not a qualified recipient for purposes of section 170(c)(2), petitioner is entitled to no charitable contribution deductions for amounts he allegedly gave to the "church."

An additional ground for not allowing any charitable contribution deduction here is that there was no "gift" because petitioner never actually relinquished dominion and control over any of the property and funds allegedly given to the "church." When petitioner deposited his paychecks to the "church" account, he anticipated receiving the benefit of them since he and his wife were the only signatories of that account, which they freely used to pay personal expenses. Similarly, the purported transfer of petitioner's Allegan residence and other property failed to constitute actual gifts since petitioner continued to use them just as he had before the purported transfer. *Harcourt v. Commissioner*, T.C. Memo. 1982–621; *Solander v. Commissioner*, T.C. Memo. 1982–161; *Manson v. Commissioner*, T.C. Memo. 1980–315; *Calvin K. of Oakknoll v. Commissioner*, T.C. Memo. 1978–336, affd. per unpublished order 603 F.2d 211 (2d Cir. 1979).

## Personal Exemptions

On his 1976 return, petitioner listed his marital status as single even though he had a wife and two children. In

---

[8]See also *Harcourt v. Commissioner*, T.C. Memo. 1982–621; *Pusch v. Commissioner, supra*; *Solander v. Commissioner*, T.C. Memo. 1982–161; *Manson v. Commissioner*, T.C. Memo. 1980–315; *Calvin K. of Oakknoll v. Commissioner*, T.C. Memo. 1978–336, affd. per unpublished order 603 F.2d 211 (2d Cir. 1979).

determining the deficiencies for 1976 and 1977, respondent did not allow petitioner to deduct personal exemptions with respect to his wife and two children. Petitioner argues he is entitled to these deductions.

Unfortunately for petitioner, he introduced no evidence whatsoever on this issue. Petitioner bears the burden of proof under Rule 142(a), Tax Court Rules of Practice and Procedure, to show that for purposes of section 151(b) his wife had no gross income and was not the dependent of another taxpayer and that for purposes of section 152(a) he furnished half the support of each child. This he has failed to do, so we must hold for respondent on this issue. *Breland v. United States*, 323 F.2d 492, 497 (5th Cir. 1963).[9]

## *Sale of Residence*

As discussed earlier, petitioner and his wife executed a quitclaim deed dated March 16, 1977, purporting to transfer their Allegan residence to the "church" for $1 of consideration. On July 9, 1977, petitioner, as trustee for the "church," sold the Allegan residence for $48,000. On audit, respondent determined that petitioner had a basis of $27,000 in the house and that he should have reported capital gain of $21,000. On brief, respondent states that the petitioner's basis was $37,000, so that only $11,000 of gain need be reported. Petitioner has introduced considerable evidence of improvements to the house that would increase his basis in it, but his primary contention is that the rollover provision of section 1034(a) protects him from having to recognize any gain on the sale of the Allegan property. He testified that the "church" used the money from the sale of the Allegan house to purchase in September 1977 another piece of "church property," which he also used as living quarters.

We believe there is sufficient documentary evidence in the record to show the proceeds from the sale of the Allegan residence were used by petitioner to purchase a new residence. Petitioner introduced a deed, dated September 3, 1977, and recorded on September 6, 1977, in which third parties transferred real estate in Chelsea to petitioner and his wife. The

[9]See also *Kolb v. Commissioner,* T.C. Memo. 1975–272.

deed did not state the total consideration paid for the property, but other evidence indicates petitioner paid at least $59,000 for it. On August 30, 1977, petitioner wrote a check for $59,000 on the "church" account which he used to obtain a cashier's check payable to himself for that amount. He endorsed the cashier's check over to Pierson and Riemenschneider. Pierson notarized the September 3, 1977, deed, and Riemenschneider witnessed it. This, we believe, is sufficient to establish the purchase of the property for at least $59,000.

Respondent argues that even if we make this finding, section 1034 does not apply because the Chelsea property was described by petitioner as "church" property, and he did not establish what portion of the property was used as living quarters. We have already explained why the "church" cannot be viewed as a separate entity from petitioner, which totally defeats respondent's position here. Furthermore, the "church" apparently had no members other than petitioner and his wife, and it held no regular worship services. Thus, it is apparent that petitioner's "church" activities did not detract from his use of his residence entirely as living quarters. On this basis, we find that the section 1034 rollover provision applies to prevent recognition of gain from the sale of the Allegan residence.

## Additions to the Tax

By amended answer, respondent asserted that all or part of petitioner's underpayment of tax in the years in issue was due to fraud and that petitioner was therefore liable for the section 6653(b) addition to the tax. We have found that petitioner was not entitled to exclude income he received in these years, so there was clearly an underpayment of tax in each year. We must resolve whether some part of each underpayment is due to fraud.

The issue of fraud is factual in nature, with respondent bearing the burden of proof. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The crucial determination is whether petitioner had an actual, specific intent to evade a tax believed to be owing. E.g., *Webb v. Commissioner*, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; *Powell v. Granquist*, 252 F.2d 56, 60 (9th Cir. 1958); *Estate of Pittard v. Commissioner*, 69 T.C. 391, 400

(1977). This intent may be inferred from circumstantial evidence. *Powell v. Granquist, supra* at 61; *Gajewski v. Commissioner*, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); *Beaver v. Commissioner*, 55 T.C. 85, 92–93 (1970).

Petitioner claims that he honestly believed he was exempt from taxation because of his relationship with the "church" he created. Respondent argues that the creation of the "church" was simply a camouflage he tried to use to shelter himself from taxes.

It is hard to believe any individual, much less one as well educated as petitioner, could honestly believe that he could escape liability for income taxation and still enjoy unfettered use of all the income he received by so simple a step as the creation of the "church." Petitioner may well have honestly believed in the tenets of the Life Science Church, but the evidence before us shows that he did not believe his creation of the "church" would legitimately insulate from taxation, wages, and other amounts received by him.

Even before his ordination by the Life Science Church, petitioner had upon occasion remarked to others that churches enjoyed tax exemption. Thus, when he executed the vow of poverty and created the "church," he understood the supposed tax benefits he might receive by assigning his income to a church. Although the vow of poverty purported to transfer all his assets and income to the "church," it also provided that all the property was to revert to him if "civil government officialdom were to 'void' this act * * * by blocking the rightful tax-exempt status and maintenance of the Church or order." The vow of poverty was not drafted by petitioner, himself, but was a preprinted form furnished by the Life Science Church, and the above language should have alerted him to the fact that the materials furnished to him by the Life Science Church would not necessarily be sufficient to create a church that would legitimately enjoy tax exemption. Petitioner should have been further alerted by the fact that the clinic agreed to cease withholding income and FICA taxes from his wages only after he signed a memorandum of understanding agreeing to indemnify the clinic for any liability and expenses for such action.

These documents, indicating only that petitioner should

have had doubts as to whether he could escape taxation by his creation of the "church," do not by themselves conclusively establish that petitioner had the actual intent to evade tax. But there is much more substantial evidence in this case of petitioner's fraudulent course of action.

We have found as a fact that the $500 check to the Life Science Church, which petitioner paid before he received the documents he used to set up his "church," was backdated to December 30, 1976, even though it was actually written in mid- or late February of 1977. This purposeful backdating of the check not only undermines petitioner's credibility, but more importantly, shows that in setting up the "church" and becoming a minister, he was motivated by the prospect of tax savings, not by religious conviction.

Petitioner's submission of the Form 4029 is further evidence that he was motivated by a desire to evade taxes. The form stated his conscientious opposition as a member of the "church" to acceptance of insurance benefits. However, during 1977, petitioner made payments for insurance similar to those made during 1976. Indeed, on April 5, 1977, and April 7, 1977—just a few days prior to the date he submitted the Form 4029—petitioner wrote checks from the "church" account for life insurance policies on his life.

Several other acts by petitioner are significant. As we have pointed out already, there was no shadow of a basis for petitioner to believe that his income for 1976 could be sheltered by his purported creation of a church in early 1977 with backdated documents. His filing of proper returns for earlier years demonstrates that he was aware of his income tax obligations, and on his return for 1976, he claimed to be a single person although he obviously knew that he was still married.[10] Moreover, his filing of a false Form W-4E, an act done several months prior to his creation of his alleged "church," cannot be justified or excused.

---

[10]It is not clear from the record why petitioner falsely listed his filing status as single. We can speculate that he may have done this for fear that his wife would also be held responsible for tax fraud if the backdating of the "church" documents were discovered or perhaps he believed his vow of poverty might be more readily accepted if he filed as a single individual. At any rate, his incorrect statement as to his filing status was obviously a knowing falsehood, which provides one more link in a chain of evidence showing intent to evade taxes.

On the basis of these facts, it is clear that the underpayments in 1976 and 1977 were due to fraud. Because we find petitioner liable for the section 6653(b) addition to the tax for both 1976 and 1977, we need not consider respondent's alternative claim with respect to the section 6651(a) and 6653(a) additions to the tax.

Through his memorandums of understanding with the clinic and Chelsea Physicians, petitioner caused no income taxes to be withheld on amounts paid to him in 1977, and he made no other estimated income tax payments in 1977. The section 6654 addition to the tax is imposed for underpayments of estimated tax. Under section 6654(b), there was clearly an underpayment of estimated tax. Petitioner obviously does not qualify under any of the exceptions set out in section 6654(d). Thus, he is liable for the section 6654 addition to the tax for 1977.

*Decision will be entered under Rule 155.*