EMMETT K. CHAFFIN, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chaffin v. Commissioner
Docket No. 7823-80.
United States Tax Court
T.C. Memo 1983-394; 1983 Tax Ct. Memo LEXIS 397; 46 T.C.M. (CCH) 673; T.C.M. (RIA) 83394; July 7, 1983. *398 William A. Meadows, for the petitioner. Ivan A. Gomez, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in, and additions to, petitioner's Federal income taxes as follows: Year
Deficiency
Sec. 6653(b) Addition [1]
1974
$7,388
$12,632
1975
6,992
15,089
1976
29,873
14,937
Due to concessions, [2] the only issue remaining for our decision is whether any part of the deficiency for each year is due to fraud within the meaning of section 6653(b). FINDINGS OF FACT Most of the facts in this case have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by reference. Petitioner, Emmett K. Chaffin, resided in Florida when he filed his petition. At all relevant times, petitioner worked as a pilot for Delta Airlines. He obtained his flight assignments on the basis of seniority at monthly bidding sessions with *399 other Delta pilots. His favorite and most frequent flight assignment was a route from Miami to San Francisco and back. This route involved stops in Chicago, Atlanta and New York on the way to and from San Francisco. It took about one week to complete. Occasionally, between flight assignments petitioner would have as much as a week or two, which he was free to use as he wished. During these periods, he served as a volunteer police officer in Medley, Florida. Petitioner was a heavy drinker from about 1965 through 1976. When not working he would drink between two and three six packs of beer each day. However, he never drank while on the job, nor did he ever fly commercial aircraft while under the influence of alcohol. In fact, petitioner would stop drinking about 24 hours prior to any flight. He was not as careful about drinking when he was not working, and as a result, his driver's license was revoked. Petitioner's wife worried about his drinking and felt that it was causing him to use poor judgment. She confided her fears to Dr. Moore, her personal physician. Dr. Moore occasionally observed petitioner accompanying Mrs. Chaffin to his office, but he never examined petitioner *400 as his patient, nor did he give him any psychological examinations. Prior to about the middle of 1972 petitioner submitted proper Forms W-4 to Delta, and filed proper income tax returns with the respondent. However, on August 1, 1972, petitioner submitted a Form W-4E to Delta which falsely declared under penalties of perjury that he had incurred no liability for Federal income tax for the preceding year and that he anticipated that he would incur no liability for Federal income tax for the current year. He submitted other similarly false forms to Delta during 1973, 1974 and 1975. If petitioner had not filed these forms, Delta would have withheld the following additional amounts of income tax from petitioner's salary: Year
Additional Withholding
1972
$3,443.10
1973
14,243.69
1974
18,942.23
1975
19,179.00
In or about April of 1973 petitioner submitted a Form 1040 to the Internal Revenue Service which purported to be his income tax return for 1972. Most of the spaces on the form were blank, but several references were made in attachments to various constitutional provisions. The Form 1040 did not contain sufficient information from which petitioner's *401 taxable income could be computed.Petitioner was furnished with the Form 1040 for 1972, as well as with the Form W-4E which he submitted to Delta on August 1, 1972, by the Tax Rebellion Committee of Los Angeles (which perhaps by a freudian slip the petitioner during the trial repeatedly referred to as the "Tax Evasion Committee").When received by him each form was already filled in except for "one or two little places" and all he had to do was "sign it." The forms cost him about "four or five dollars." Before using them, petitioner showed both forms, together with other information he had received from the Tax Rebellion Committee, to the accountant who had prepared his income tax returns for 1968 through 1971. The accountant advised him not to use the forms because the constitutionality of the income tax laws had already been established by the courts and the use of the forms would get him into "a lot of trouble." After 1973, petitioner filed no further income tax returns or Forms 1040 with the Internal Revenue Service until January 1977. At about the time that petitioner stopped complying with the income tax rules and regulations, he began to change the manner in which he handled *402 his finances. From January 1971 to October 1972, he had maintained a checking account in his own name at Bank of Kendall. However, in October 1972, he converted this account to a trustee account and, by 1974, he had closed the account entirely. By 1974, he had also stopped depositing his salary check from Delta to accounts in his own name. Instead, he converted many of the checks to cash or traveler's checks and other negotiable instruments. He also deposited some of the salary checks to accounts held in the name of his wife, his minor son, or the Kendall Universal Life Church. Petitioner was the sole source of deposits to these accounts, as his wife and son earned no income of their own. Petitioner controlled the church account. Petitioner used the funds in each of these accounts to make personal expenditures, such as for taxes, food, mortgage payments and legal fees. At or about the same time, he began to conceal his ownership of certain assets. In 1973, he conveyed his new Mercedes Benz to his father-in-law. In 1974, title to the car was transferred again to the Kendall Universal Life Church. Petitioner, however, continued to maintain and operate the vehicle as his *403 own. Similarly, in 1973, petitioner and Mrs. Chaffin transferred title in their residence to their minor son in exchange for a promissory note. However, in the conveyance they reserved a life estate in the property and continued to reside in, maintain, and pay the expenses of the residence, while their son never made any payment on the note. In addition to petitioner's rearrangement of his financial affairs, he actively sought to conceal his finances from the Internal Revenue Service. In 1972, a special agent began to investigate his income tax liability and shortly thereafter the petitioner began stamping the backs of his salary checks with the notation: No copy permitted without signed permission of signer(s). Up to $5,000 fine and 10 years in prison. U.S. Criminal Code Title 18 Sec. 241-242, Amend. 1, 4, 5, 6 & 7U.S. Const. He also wrote letters to the banks at which he kept the trustee accounts and the accounts for his wife and the Kendall Universal Life Church. He instructed these banks not to cooperate with any investigation by the Internal Revenue Serivce, using language such as: [Do not] reveal, divulge or disclose, to Any person, and more especially *404 to Any agent of the Internal Revenue Service, under Any excuse or pretext whatsoever, Any information concerning or connected with, deposits, withdrawals or any other Thing, having to do with past, present or future checking or saving accounts in your bank. IT IS FURTHER RESOLVED, That I will prosecute to the uttermost any violation of your fiduciary trust or aforesaid instructions, unless upon receipt of a valid court order in accord with "due process of law" as outlined in the Constitution of The United States. Moreover, when petitioner was being investigated by the Internal Revenue Service, he hired one Lucille Moran, a self-proclaimed "knowledgeable defense attorney on income tax matters" to assist his defense of his tax rebellion efforts. On petitioner's behalf, Ms. Moran wrote to the Internal Revenue Service and the United States Attorney to inform them: Please be now advised that by resisting the withholding tax scheme, Captain Chaffin is putting himself on record as REJECTING both the PEON status AND the quaint but mistaken notions entertained by Revenuers and other dudes living off public payrolls THAT statutory enactments on that SECOND SET OF BOOKS can somehow *405 supersede Constitutional guarantees. He takes the stand that he owes NO involuntary tribute (financial or political) to any Man, any group, companionship or association of Men attempting to expunge his XIIIth Amendment safeguards against involuntary servitude by apocryphal writings. [Emphasis in the original.] In 1975 the petitioner was indicted in the United States District Court for the Northern District of Georgia on three counts under section 7205 for filing false Forms W-4E with Delta for 1972, 1973 and 1974 and on two counts under section 7203 for failing to file income tax returns for 1972 and 1973. After a jury trial he was convicted on all five counts and on November 21, 1975, an order was entered by the District Court, which provided in part: * * * that the defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of ONE (1) YEAR on each of counts four and five, THREE (3) MONTHS of this sentence to be served in a jail-type institution, and that the execution of these sentences shall run concurrently with each other, but that the remainder of this sentence be, and the same hereby is suspended *406 until the further order of the court, and that the defendant be placed upon probation for the period NINE (9) MONTHS with the SPECIAL CONDITION that the defendant file all income tax returns and pay all taxes due and owing to the United States, and correct the W4-E form filed with Delta Air Lines. * * * Petitioner appealed from his conviction but it was affirmed by the Court of Appeals for the Fifth Circuit in October of 1976 and a petition for certiorari was denied by the United States Supreme Court. Thereafter, in January, February and March of 1977, the petitioner filed with the respondent a Form 1040 for each of the years 1972 through 1976 which forms again purported to be his income tax returns for such years. However, on each of these Forms 1040 the petitioner represented that for that particular year he has less than $740 in taxable income and owed $5.00 in income tax. Each 1040 was also accompanied by 32 pages of material furnished by The Tax Rebellion Committee of Los Angeles which contained among other things references to various constitutional provisions and lengthy discussions of abortion, the "gold dollar" and foreign aid.
On October 14, 1977, the District Court *407 upon motion made by the petitioner's probation officer revoked his probation and committed him to serve the nine months remaining on his sentence. On January 26, 1978, petitioner finally filed proper income tax returns for the years 1972 through 1976. These returns were prepared by a Certified Public Accountant and reflected the following taxable income and tax liabilities: Year
Taxable Income
Total Tax Liability
1972
$33,272
$12,910
1973
38,425
15,757
1974
42,084
17,877
1975
50,641
22,886
1976
51,285
23,297
No part of the total tax liability had been paid at the time of the trial. OPINION Respondent contends that some part of petitioner's underpayment of tax for each year in issue was due to fraud and as a result the petitioner is liable for the addition to tax provided by section 6653(b). Respondent also asserts that the underpayment in each year was attributable to petitioner's negligence and that in addition his returns were delinquent. Consequently, in the alternative the respondent argues that the petitioner is liable for the additions to tax provided by sections 6653(a) and 6651(a)(1), respectively. Respondent has the burden *408 of proving that petitioner's underpayments are due to fraud by clear and convincing evidence. Section 7454(a); Rule 142(b). The evidence must show that petitioner intended to conceal or evade taxes which he believed properly to be owing. Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941); Kellett v. Commissioner,5 T.C. 608 (1945). We find that respondent has satisfied his burden of proof with respect to fraud.Therefore, we need not consider his alternative arguments under sections 6653(a) and 6651(a)(1). First, petitioner failed to file any income tax return between 1971 and 1978. Mere failure to file does not, without more, establish fraud, Breland v. United States,323 F.2d 492 (5th Cir. 1963), but the circumstances surrounding petitioner's failure to file clearly demonstrate his intention to evade taxes. In 1973 and 1977 petitioner filed with the Internal Revenue Service, Forms 1040, festooned with constitutional objections and devoid of information from which his taxable income could be computed. These Forms 1040 did not qualify as income tax returns. United States v. Smith,618 F.2d 280 (5th Cir. 1980); *409 United States v. Porth,426 F.2d 519 (10th Cir. 1970); Reiff v. Commissioner,77 T.C. 1169 (1981). However, petitioner's failure to file the proper Forms 1040 was not due to his ignorance of the correct procedure because he and his wife had filed proper returns for the years 1968 through 1971. See Veino v. Fahs,257 F.2d 364 (5th Cir. 1958); Gemma v. Commissioner,46 T.C. 821 (1966). Moreover, his accountant informed him that he should follow his accustomed method of preparing returns, rather than following the filing instructions of the Tax Rebellion Committee of Los Angeles. Petitioner ignored the accountant's admonition that he would "get in trouble" if he chose the letter course. Petitioner finally filed proper returns for the years 1972 through 1976, but only in 1978 after he had been ordered to do so by the District Court, and after he had his probation revoked for failure to file returns or pay the tax due. Petitioner also filed Forms W-4E between 1972 and 1975, in which he falsely represented to his employer that he had no income tax liability for the previous year and did not expect to incur such liability *410 during the current year. The District Court found petitioner criminally liable for filing the false Forms W-4E during 1972 and 1973, but it did not consider the years 1974 and 1975. However, it is obvious that the Forms W-4E for the latter years were equally false. From 1972 through 1975, petitioner had an annual gross income exceeding $45,000. Moreover, in the returns which he filed in 1978, petitioner conceded that during each year he had incurred an income tax liability exceeding $12,000. Thus, these affirmative misrepresentations by petitioner further contribute to our conclusion that petitioner's underpayment of taxes for the years 1974 and 1975 was due to fraud. See Stephenson v. Commissioner,79 T.C. 995 (1982). Finally, petitioner's behavior between 1972 and 1976 with respect to his finances shows a pattern of conduct intended to conceal taxable income. In 1972, petitioner stamped messages on the backs of his checks in an attempt to keep them from being photocopied. During that year he also wrote letters to various banks demanding that no accounts, checks or other records be divulged to the Internal Revenue Service. Furthermore, in 1972 and 1973, he *411 transferred title to his car and his home, but he continued to use and care for both without change. In 1974, petitioner stopped depositing his paychecks into accounts bearing his name and converted the checks to cash or deposited them in accounts under other names. However, he continued to use the cash and the funds in the accounts for his personal expenses. In sum, the facts of this case show clearly and convincingly that petitioner intended to conceal and did conceal his taxable income in a fraudulent attempt to evade his income tax liability for each year in dispute. Petitioner nonetheless contends that his actions were not fraudulent. Instead, he claims that during the years in issue he was suffering from impaired judgment due to his heavy drinking habits. Petitioner asserts that from 1972 through 1976 his deficient mental powers caused him to believe, honestly and sincerely, that the income tax laws were unconstitutional, and his duty was to resist them. Incompetency, brought about by disease or mental illness, may preclude the formation of fraudulent intent. Martin v. Commissioner,272 F.2d 191 (2d Cir. 1959); Hollman v. Commissioner,38 T.C. 251 (1962); *412 Collins v. Commissioner,7 B.T.A. 913 (1927). However, we have held that a taxpayer's heavy drinking or even alcoholism does not necessarily result in incompetency which precludes a finding of fraudulent intent. See, e.g., Moor v. Commissioner,T.C. Memo. 1973-204; Craddock v. Commissioner,T.C. Memo. 1963-164. Dr. Moore, the physician for Mrs. Chaffin, petitioner's wife, testified that petitioner exhibited alcoholic-type behavior during the years in issue. Apparently Mrs. Chaffin had complained some time in 1965 to Dr. Moore about what she considered to be her husband's excessive drinking. The physician then observed petitioner on a few occasions as he accompanied Mrs. Chaffin to the doctor's office. These observations served as the basis for his testimony at trial. Under these circumstances we must give little weight to the physician's testimony. He never examined petitioner physically or psychologically. Furthermore, the record contains no evidence that any other doctor ever examined or treated the petitioner during the years in issue or found him to be an alcoholic or that his judgment was impaired. Based upon the record *413 before us, we are convinced that petitioner's intent to evade income tax was not caused by heavy drinking or alcoholism. During the same period of time he successfully piloted commercial aircraft and served on a volunter police force. When he was working he did not drink and, at least before he flew, he made sure that he was sober by not drinking for 24 hours. In fact, on petitioner's preferred flight assignment between Miami and San Francisco, he would often spend a week without drinking. Even if drinking rendered him gullible at times, he certainly had long periods of lucidity during which he was the captain of an aircraft which crossed and re-crossed the continent many times without incident and without arousing the suspicions of his passengers and fellow crew members. Surely if he could do this, he could, if he desired, have evaluated the flimsy constitutional arguments made by the Tax Rebellion Committee. It seems more logical on this record to conclude, therefore, that he deliberately chose to follow the Committee's advice which cost about four or five dollars rather than rely upon the sound counsel of his accountant for several years who had advised him that there was no *414 real constitutional question and that he should file proper returns. Even if we accept as true petitioner's contention that, at least in the beginning, he was innocently misled into believing that the Committee's theories were constitutionally sound, we cannot understand his refusal to recognize their baseless character after his use of such theories had led to his conviction on five counts by a jury in the District Court, the affirmance of that conviction by the Court of Appeals for the Fifth Circuit, and the denial of his application for certiorari by the Supreme Court of the United States. The use, therefore, after all the foregoing, of such theories in the preparation of the Forms 1040 which he filed in early 1977 demonstrates, in our mind, a total disrespect for our entire judicial system. By no stretch of the imagination can we consider this defiant act as part of an innocent and honest attempt to once again test the constitutionality of the income tax law. Petitioner's surreptitious acts in the cashing of his paychecks, the use of bank accounts in names other than his own, the filing of false Forms W-4E, and the failure to file returns from 1972 through 1976 further *415 indicate that he himself did not believe in the rectitude of his conduct.Instead, he sought to hide his resistence to taxation at every step, so as to avoid alerting those responsible for the administration of the tax laws. Hindman v. Commissioner,T.C. Memo. 1983-389. [2] Far from having his judgment impaired during the years in issue, it appears to us that petitioner was unusually adept in the handling of his financial accounts in the manner he chose, while at the same time, satisfying the requirements of his two jobs with Delta and the police force. Thus, we are convinced that the underpayments for each year were due to fraud, and that the petitioner is liable for the addition to tax under section 6653(b). Finally, petitioner argues that even if he is liable for the addition to tax due to fraud, the amount of the underpayment subject *416 to the addition should be reduced. He contends that the amount of income tax he reported on the returns filed in 1978 must be subtracted from the amount of tax which he owes to determine the proper amount of the underpayment. This position has no merit. See Hirschman v. Commissioner,12 T.C. 1223 (1949). Furthermore, Section 6653(c), in defining "underpayment," states that the tax shown on a return "shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing * * *." [Emphasis added.] See also section 6211. Petitioner's income tax returns for 1974, 1975 and 1976 were filed in 1978, long after their due date. Thus, petitioner's underpayment of income tax will be measured by his deficiency in payment as defined in section 6653(c). To reflect the foregoing, and to account for the concessions made by respondent, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, during the years in issue.↩
2. On brief respondent conceded the capital loss issue which was still unresolved at the trial.↩
2. On these facts, Raley v. Commissioner,676 F.2d 980 (3rd Cir. 1982), revg. a Memorandum Opinion of this Court, is distinguishable. In Raley,↩ the taxpayer made clear and repeated efforts to notify and alert the government of his refusal to pay income taxes prior to any government investigations thereof.