CHESTER RUTANA and THERESA M. RUTANA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rutana v. Commissioner
Docket No. 6759-84.
United States Tax Court
T.C. Memo 1986-336; 1986 Tax Ct. Memo LEXIS 260; 52 T.C.M. (CCH) 1; T.C.M. (RIA) 86336; August 4, 1986. Joseph R. Young, Jr., for the petitioners. Steven M. Walk, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes and additions to tax for fraud pursuant to section 6653(b) [1] for the taxable years 1975 and 1976 as follows: Year
Deficiency
Addition to Tax
1975
$3,779.65
$1,889.83
1976
$2,026.52
$1,013.26
Petitioners' agree with the Commissioner's determination of the deficiency for 1975, but the statute of limitations bars assessment of that deficiency unless petitioners' 1975 return *261 was false and fraudulent within the meaning of section 6501(c)(1). Petitioners have paid the deficiency determined for 1976 which is not at issue in this case. Therefore, the only issue that this Court must decide is whether any part of the underpayment for 1975 or for 1976 is due to fraud with intent to evade Federal income tax within the meaning of section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners, Chester and Theresa Rutana, are husband and wife who resided in Poland, Ohio at the time their petition was filed. Since 1964 Chester has operated his own business, Rutana Landscaping. Rutana Landscaping provides year round services, and Chester works on every job, assisted by one or two men. Before starting Rutana Landscaping Chester worked as a foreman for a landscaping company and as a general laborer. Chester Rutana is a simple, soft-spoken, self-effacing man who has an 8th grade education, no accounting or bookkeeping experience and difficulty with simple arithmetic. He has never prepared a tax return or assisted in any banking activities other than occasionally endorsing a check. Theresa Rutana attended high school *262 for 3 1/2 years from 1941-1944. In 1975 she earned her high school equivalency certificate. During the years in issue, she had no training in bookkeeping or accounting except for an introductory high school course taken in the 1940's. Theresa was Rutana Landscaping's sole bookkeeper. She kept all records and did the banking for petitioners. When Chester started Rutana Landscaping, petitioners consulted with attorney John Lynch, who did not show them how to maintain records, advise them on rudimentary banking practices or inform them about their tax responsibilities other than to keep records of receipts, wages and expenses. To comply with Lynch's advice Chester kep a small memo paid with him in which he recorded, for each job, the customer's name and charge, the supplies used and their cost, and the hours each man worked. At home he transferred the information into a log book and left Theresa notes on the refrigerator listing customers to be billed. Theresa would mail a customer an invoice and retain a copy for the file. Partial payments were recorded on the appropriate invoice. Most payments were recorded on monthly gross receipts sheets, by customer's name, check number, *263 and amount and date of payment, after the customer's check was deposited in petitioners' checking account. Petitioners maintained one checking account for both business and personal use in which Theresa deposited substantially all business gross receipts. Petitioners also maintained oned savings account in which it appears Theresa deposited $2,500 of a $2,961.02 check dated September 21, 1976 from Helen Bair, a customer. The full $2,961.02 was, however, recorded on the receipts sheet for September, 1976. Theresa would collect the checks to Rutana Landscaping on a shelf and deposit them periodically. Before going to the bank Theresa would fill out a deposit slip and on an envelope write the date each check was received, the check number, the customer's name and the amount. She then put the envelope in a purse. Theresa would record the information she had written on the envelope on the monthly receipts sheet after going to the bank but before the end of the month. Sometimes she forgot to record the deposits. At the bank Theresa never received duplicate deposit slips, and the record of the deposit was entered in the front of the check book by the teller. When Theresa received *264 a bank statement she recorded the service charge and noted which checks had cleared. Theresa did not keep a current, running balance in the check register. She recorded deposits only when the balance in the register got low and subtracted the checks she had written about once a week. She frequently subtracted incorrectly. Theresa did not reconcile her check register with the bank statements. She did not know how to reconcile her check register with a bank statement until instructed by John Funcheon, CPA, in 1978; Funcheon was retained by petitioners during their audit. As a result of consulting with Funcheon, petitioners significantly changed their bookkeeping system. Funcheon worked for the Internal Revenue Service from 1948 until 1976, first as a revenue agent and then as a group manager. Funcheon's review of petitioners' records and recordkeeping practices revealed that Theresa had a minimal knowledge of accounting and bookkeeping. Funcheon set up a new bookkeeping system for petitioners. Until instructed by Funcheon, Theresa was incapable of adequate and accurate bookkeeping. Under Theresa's bookkeeping methods in effect in 1975 and 1976, it was impossible to know Rutana *265 Landscaping's income or expenses for either 1975 or 1976. Often Chester would need money to buy gas and supplies when he went out on a job. Theresa would give Chester a check for the amount due, a check that would be cashed, or cash. During 1975 and 1976 Theresa did not normally take cash directly out of customer deposits but would write a check for cash and give Chester the money. Chester did not always get receipts when he paid cash but tried to save the ones he received. Theresa kept the receipts in a manila envelope. She did not keep a journal of expenses. Petitioners' tax returns were prepared by James Fabili, who did not personally examine petitioner's records, checks or receipts. In preparing petitioners' tax returns, Fabili used a one-page summary of income and expenses prepared by Theresa. To determine gross receipts for the year Theresa would tally the monthly receipts sheets on a summary sheet. She did not use bank deposits to determine gross receipts, never added the deposits made during the year and did not know the total amount of checks that cleared the account in a given year. She used customer invoices to prepare semi-annual sales tax returns but not to *266 determine gross receipts. She determined the sales tax deduction from the semi-annual sales tax returns. Theresa added the receipts filed in the manila envelope to determine Rutana Landscaping's expenses. For salary expenses Theresa relied on a book in which she recorded the men's time. To determine charitable deductions Theresa examined the check register. To determine interest deductions she used the bank's year-end statement of mortgage payments. When Theresa gave the summary sheets that she prepared at the end of each year to Fabili in 1975 and 1976 she believed that they fully stated gross receipts and expenses. Petitioners' 1975 and 1976 Federal income tax returns understated Rutana Landscaping's gross receipts by $17,706.98 and $11,503.18, respectively. In 1975, Theresa received $5,266.67 in settlement of claims for a whiplash she received in an automobile accident. The whiplash compounded her difficulties in keeping records because she could not work with her head bent over for long periods of time. Theresa included the settlement proceeds on her income summary for 1975 because she did not know if the proceeds were taxable and wanted to let the tax preparer decide. *267 Petitioners and the younger two of their three children lived in a modest, single story home purchased in the late 1950's. In 1975 and 1976 the monthly mortgage payment was $117. Their home was furnished and decorated simply. Petitioners sent their two younger children to parochial school. Mary Kay, their second daughter, graduated in August 1975 and attended College of Mt. St. Joseph in the fall of 1975. In 1975 petitioners paid $322 in tuition to their daughter's parochial school and paid part of their daughter's college tuition. Mary Kay also had a job, two grants and student loans. In 1975 petitioners paid $158.50 to the College of Mt. St. Joseph. In 1976 petitioners paid $1,588.50 to the College of Mt. St. Joseph. Petitioners' check register indicates that they paid $174.27 in 1975 and $243.11 in 1976 in tuition for their son's parochial education. Petitioners made one major purchase in 1975. They purchased a new car for approximately $6,000.00, putting $2,000.00 down and financing the remainder. The monthly payments on this debt were approximately $173.00. In 1976, petitioners made two major purchases: a used truck and a used car. Petitioners bought the used truck *268 with $2,500.00 that Chester had inherited. Petitioners purchased the used car for $3,000 for Mary Kay who needed transportation to and from work while she was in college. Of the $3,000, petitioners drew on their checking account for $2,186.85. They used "cigarette" money they had saved for 5 years after Chester stopped smoking to pay the balance. On October 3, 1977 petitioners were informed by letter that their 1976 tax return would be audited and that an appointment was scheduled for October 17, 1977 with tax auditor Scott Simmerman. Theresa appeared for the first interview and Simmerman requested additional information, including canceled checks and invoices. On November 11, 1977 Simmerman talked with Theresa by phone to request more information and to tell her the audit would include petitioners' 1975 return. Both petitioners appeared for another interview on December 7, 1977. At that meeting Simmerman noted that there was a significant disparity between gross receipts for 1975 as listed on the monthly receipts sheets and the total amount of bank deposits for 1975. On January 16, 1978 Theresa gave Simmerman a list of checks that she had forgotten to record on the receipts *269 sheets for 1975. Simmerman was particularly concerned about a $5,000.00 check that petitioners received in 1976 but which Theresa forgot to record. At one meeting with Simmerman, Theresa's list of omitted checks showed the check number, but she was unable to remember the source of her information. She called Simmerman later and explained that she had found the check number on the customer's billing invoice. Petitioners cooperated fully with Simmerman, provided him with consistent explanations for the failure to report the omitted income and did not attempt to conceal any of their income. Theresa's explanations for omitting the gross receipts sheets remained consistent through the audit and at trial. She found some of the missing items written on envelopes in her purses.There was no pattern to Theresa's forgetfulness. At least one omitted check in the amount of $601.31 was received in December, 1976 and not deposited until 1977. In addition, records of approximately $3,000 in other December 1976 omitted receipts were found by Theresa with her 1977 records. The checks Theresa omitted from the monthly receipts sheets correlated with the unexplained checking account deposits *270 that Simmerman found. As a result Simmerman discontinued the net worth examination for 1975 and 1976. Based on a summary of petitioners' 1976 expenses that he asked Theresa to prepare, Simmerman also allowed petitioners an additional deduction for 1976 in the amount of $1,773.68. Although he suspected petitioners of fraud, Simmerman allowed the additional deduction without verifying Theresa's expense summary. In addition to the omitted items for 1975, Simmerman also found mathematical errors on the monthly receipts sheets. In May 1975, Theresa overstated income by $52.15, and in August 1975 she recorded the total receipts as $4,832.92 instead of $8,432.92, a transposition error resulting in a $3,600.00 understatement of income. The error was a common transposition error that Theresa was unable to detect because she used a single-entry bookkeeping system which provides no checks and balances for the figures recorded. Although he had no other explanation, Simmerman did not believe that the understatement was the result of a transposition error and therefore did not discuss that possibility with Theresa. Until the trial Simmerman was unaware of the bookkeeping system that petitioners *271 used. OPINION Fraud is a factual question to be resolved by an examination of the entire record. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Respondent must show by clear and convincing evidence that petitioners acted with specific intent to evade a tax that they knew or believed they owed. Stephenson v. Commissioner,79 T.C. 995, 1005 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Rule 142(b), Tax Court Rules of Practice and Procedure. Fraud is never presumed, Beaver v. Commissioner,55 T.C. 85, 92 (1970), but may be proven by circumstantial evidence because direct proof of a taxpayer's intent is rarely available. Stephenson v. Commissioner,79 T.C. at 1005-1006. Petitioners' entire course of conduct must be examined to determine whether the requisite fraudulent intent exists. Solomon v. Commissioner,732 F.2d 1459, 1461 (6th Cir. 1984); Stone v. Commissioner,56 T.C. 213, 223-224 (1971). Mere suspicion of fraud *272 is insufficient and fraud will not be imputed or presumed. When a claim of honest mistake is presented, this Court must consider the taxpayer's intelligence, education and expertise in tax matters in determining whether fraud exists. Adler v. Commissioner,422 F.2d 63, 68 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Drobny v. Commissioner, 86 T.C.     (filed June 26, 1986); Iley v. Commissioner,19 T.C. 631, 635 (1952). Respondent has failed to show that Chester or Theresa had a specific intent to defraud. Significant understatements of income for the taxable years 1975 and 1976 occurred in this case because of petitioners' lack of education and bookkeeping experience.Petitioners' understatement of their 1975 and 1976 income does not establish a pattern of concealment. In this case we have nothing more than understatements of income, and understatements alone are not conclusive evidence of fraud. See Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir.), cert. denied 397 U.S. 962 (1969); Marinzulich v. Commissioner,31 T.C. 487, 490 (1958). Chester has an 8th grade *273 education and no bookkeeping or banking experience. He is incompetent in arithmetic. Petitioners recognized this, and consequently, Theresa did all the banking and bookkeeping. Theresa has a high school equivalency certificate but had no bookkeeping training other than an introductory course in high school in the early 1940's. Due to her lack of training and not because of a desire to conceal income, Theresa used a rudimentary and inherently flawed bookkeeping system to record business gross receipts. Her inherently flawed methods were set in motion by incomplete and inattentive professional advice. Before depositing a check, Theresa wrote the customer's name, date received, check number and amount on the back of an envelope and put it in a purse. No checks were endorsed over to her husband, her children or creditors. In 1975 and 1976, no customer's check was cashed. Except for one check deposited in savings (which was included in income), Theresa deposited all customer checks in petitioners' checking account, but she did not immediately record the information from the envelopes on the monthly gross receipts sheets. As a result she sometimes forgot and some checks were never *274 recorded on the receipts sheets. There is, however, no discernible pattern to her forgetfulness, and none of the income was ever concealed from respondent. Theresa also included nontaxable receipts on the monthly receipts sheets. Theresa also made numerous mathematical errors, resulting in further discrepancies between actual and reported income many favoring petitioners and some favoring the Government. When petitioners learned that they may not have fully reported their income, they cooperated with tax auditor Simmerman in trying to ascertain what was missing. Theresa's explanations of omitted items of income to Simmerman were consistent throughout the audit and to this Court. Simmerman nonetheless suspected petitioners of fraud, but suspicion of fraud is not evidence of fraud. Moreover, until trial Simmerman was unaware of the serious inadequacies of petitioners' bookkeeping system which prevented Theresa from detecting mathematical errors or checks that had not been recorded. Indeed, respondent's case is, to a large extent, based on disregarding the testimony of Chester and Theresa. We found them to be credible and forthright and their testimony to be consistent with explanations *275 they gave Simmerman during audit. We believe that this Court's comments on a similar case, Iley v. Commissioner,19 T.C. at 635 are pertinent here: Although the bookkeeping was inadequate by any standard, there is no evidence of intentional concealment or deliberate misrepresentation. The errors were patent to any one versed in accountancy. The petitioners were guilty of poor judgment in not having the books audited but poor judgment and ignorance are not tantamount to fraud. There is lacking one essential element, the very heart of the fraud issue, namely, the intent to defraud the Government by calculated tax evasion. Petitioners understated their income because of inadequate bookkeeping methods used out of ignorance and because of inadvertence and clerical errors, all of which they have since rectified with the assistance of a certified public accountant. Petitioners are not liable for the addition to tax for fraud under section 6653(b) for 1975. The assessment and collection of the deficiency for 1975 is barred by the statute of limitations. Petitioners are not liable for the addition to tax under section 6653(b) for 1976. Decision will be entered *276 for the petitioners.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩