JOSEPH C. LEMIRE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ROY R. CARVER AND HEIDRUM I. CARVER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lemire v. Commissioner
Docket Nos. 11707-86; 11805-86
United States Tax Court
T.C. Memo 1988-367; 1988 Tax Ct. Memo LEXIS 392; 55 T.C.M. (CCH) 1527; T.C.M. (RIA) 88367; August 10, 1988
James T. Reilly, for the petitioner in docket No. 11707-86. Roy R. Carver and Heidrum I. Carver *, pro se in docket No. 11805-86. Kristine A. Roth and Robert N. Trgovich, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax for the taxable years 1976 and *393 1977 and additions to tax for fraud as follows: § 6653(b) [1]
Addition
Petitioner
Docket No.
Year
Deficiency
to Tax
Joseph C. Lemire
11707-86
1976
$ 359,723.48
$ 179,861.74
1977
177,249.56
88.624.78
Roy C. Carver and
11805-86
1976
$ 352,776.00
$ 189,445.00
Heidrum I. Carver
1977
172,055.19
86,027.60
In these consolidated cases the issues we must decide are (1) whether positioners Lemire and Roy Carver each received unreported income in the amounts of $ 705,000 and $ 344,000 in the years 1976 and 1977, respectively; and (2) whether any portion of the alleged underpayments of tax were due to fraud within the meaning of section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time his petition was filed, petitioner Joseph C. Lemire ("Lemire") was incarcerated at a Federal prison in Big Spring, Texas. During the period of his incarceration, he maintained a residence at Wilton, New Hampshire. Petitioners Roy C. Carver ("Carver") and Heidrum *394 I. Carver ("Mrs. Carver") were husband and wife during the years in issue. Carver resided at Torrance, California when the petition was filed. Mrs. Carver resided in Morocco at the time the petition was filed.
Background
Raytheon Company ("Raytheon") is a Delaware corporation doing business in the United States and several foreign countries. Throughout the 1970s, Raytheon, through its wholly owned subsidiary Raytheon Middle East Systems Company ("Raymes") was engaged in numerous construction projects in the Middle East including the construction of an air defense missile system for the Kingdom of Saudi Arabia. Raytheon Subsidiary Support Company ("Rassco"), another wholly owned subsidiary of Raytheon, was responsible for procuring goods and services for Raymes. In 1975 and until he resigned from Raytheon in November, [2] Lemire was the procurement manager for Raymes and Rassco. In that capacity, he procured nonmilitary materials to support Raytheon's overseas operations. Carver was a vice-president of Raymes and general manager of its operations in Saudi Arabia from 1974 until his resignation in 1977. As such, Carver was Raytheon's most senior official in Saudi Arabia. *395 Lemire, in his capacity as procurement manager, provided support materials for Carver's operations in Saudi Arabia. During the years in issue, Interconex, Inc. ("Interconex") was a Delaware corporation with its principal office at New York, New York and doing business as a freight forwarder. Jon T. Stephens was president of Interconex. Lionel W. Achuck was Chairman of the Board of Interconex. International Modular Systems, Ltd. ("IMS") was a Delaware corporation with its principal office at Annapolis, Maryland. In 1976 and 1977, IMS was engaged in the business of exporting prefabricated housing. Arthur R. Thom was president of IMS during the years in issue. Henry C. Holle, an architect, was treasurer of IMS. In May 1976, Raytheon, through Raymes, entered into a contract known as the Triad contract with the Saudi Arabian government to construct an air defense missile system. As part of the Triad project, Raymes agreed to provide modular housing for the Saudi military personnel *396 who would man the missile base and their families. Carver was charged with requisitioning, and Lemire with procuring the housing. Normal procurement procedures at Raytheon required a formal requisition for materials prior to awarding a contract and preapproval of large proposed contracts by higher corporate officials. The procurement office for Raymes and Rassco, which Lemire managed, however, was set up as a quick response group to handle requisitions and requirements for Raytheon's overseas operations. Because of short time periods involved, the office frequently had to take shortcuts to expedite shipments. Thus, it was not unusual to receive a request by phone and act on it before processing a formal requisition. The housing requirement for the Triad contract was urgent. After Lemire spoke to Carver, he assigned the procurement request to Gene Waxman, a senior contract administrator. Lemire instructed Waxman to request bids only from suppliers with whom Raytheon had previously dealt because of the short time frame involved. Waxman sent a telex requesting bids to three housing manufacturers on June 21, 1976. He could not recall whether he had spoken to the companies prior *397 to sending the telexes, but frequently did so on rush contracts. The telex requested the companies to submit bids by June 23, 1976. Raytheon received the following bids from the three companies that received telexes and a fourth, Bendix International, which telephoned and asked for permission to submit a bid: >100> >101> Bendix
IMS
Westyield
International
3 Bedroom Homes
(200 each)
Area
1152 sq. ft
960 sq. ft
1152 sq. ft
Factory Price
$ 15,552    $ 17,857   $ 15,027    Transportation Port
--    594   --    Transportation to 23,616    19,680   29,827    Saudi Arabia
Total Price C&F to
39,168    38,131   44,854    Saudi Arabia
Cost per square foot
34    39.7   38.9    Total price (200)
7,833,600    7,626,200   8,970,800    4 Bedroom Homes
(20 each)
Area
1440 sq. ft
not      1440 sq. ft.
responsive
Factory Price
$ 19,440    $ 18,550    Transportation to Port
--    Ditto
--    Transportation to
Saudi Arabia
29,520    Ditto
36,150    Total price C&F to
48,960    54,700    Saudi Arabia
Cost per square foot
34    Ditto
38    Total price (20)
979,200    Ditto
1,094,000    Total Price - 220
8,812,800    N/A         10,064,800    Homes
*398 Atlantic
International
3 Bedroom Homes
(200 each)
Area
1152 sq. ft
Factory Price
$ 23,400    Transportation Port
--    Transportation to 32,500    Saudi Arabia
Total Price C&F to
55,540    Saudi Arabia
Cost per square foot
48.21    Total price (200)
11,108,000    4 Bedroom Homes
(20 each)
Area
1440 sq. ft
Factory Price
$ 28,800    Transportation to Port
--    Transportation to
Saudi Arabia
34,100    Total price C&F to
62,900    Saudi Arabia
Cost per square foot
43.7    Total price (20)
1,258,000    Total Price - 220
12,366,600    Homes
The IMS bid was hand carried to Raytheon by its officers Thom and Holle on June 21, 1976, the same day they were formally asked to submit a bid. The other bids were late. IMS submitted the lowest responsive bid and was awarded the contract (hereinafter the "220 Homes Contract") on June 28, 1976, although a written requisition for the housing was not received until June 29, 1976. In submitting its bid for the housing, IMS, unbeknownst to Waxman, had an unfair advantage. Lemire had telephoned *399 Thom, the president of IMS, on June 9, 1976, to provide him with general specifications on Raytheon's housing need. Without that information, IMS would not have been able to submit more than a general bid. As a result of Lemire's phone call, which was in violation of competitive bidding procedures, IMS had more time than the other companies to prepare its bid and knew what Raytheon wanted to see in the bid. IMS' bid included transportation to be provided by Interconex. Pursuant to a teaming agreement signed by Jon Stephens and Arthur Thom on June 7, 1976, IMS and Interconex agreed to work together to submit a bid to Raytheon for construction of modular housing and shipment of that housing to Saudi Arabia. The Teaming Agreement provided in part, IMS and Interconex agree to form a joint venture whereby the parties will work together to develop contracts for the manufacture in the United States, the delivery to Saudi Arabia, and in certain cases the erection there of modular houses designed by IMS. The parties agree that IMS will be named the prime contractor in and that Interconex will be the sub-contractor to IMS for all transportation elements of any relevant project, except *400 that, unless otherwise mutually agreed, IMS will arrange to deliver the houses to the port of embarkation and Interconex's transportation responsibilities will commence at the port.
IMS submitted its bid to Raymes individually but in its proposal expressly stated that Interconex would provide shipping services. IMS had not worked with Interconex prior to the 220 Homes Contract. Thom and Holle testified that someone in procurement at Raymes suggested that they contact Interconex. They were unable to remember who made the suggestion but dealt primarily with Lemire at Raymes. Thom and Holle were told by Jon Stephens of Interconex that Interconex had performed shipping for Raytheon before and knew how to make the proper arrangements for overseas shipping and to resolve any problems that might arise. Both were given the impression that Interconex would be an acceptable shipper to Raytheon. Thom met with Stephens in New York on June 7, 1976. He questioned the shipping rate that Stephens quoted because he considered it to be high. Stephens, however, assured him that he was quoting a rate that was acceptable to Raytheon. Stephens and Thom prepared and signed the Teaming Agreement *401 at that meeting. Stephens testified that the idea for a teaming agreement originated as a result of a meeting with Lemire and Carver. Lemire, Carver, Stephens and Interconex had a business relationship independent of Raytheon (see infra). Raytheon had a company policy to use Behring International for all shipping, with the result that Interconex could not bid directly for the shipping contract. A teaming agreement was suggested as a way to incorporate the transportation bid with a housing bid. Lemire denied any knowledge of a teaming agreement between IMS and Interconex. He acknowledged discussing the use of teaming agreements with Stephens in another context but denied ever discussing Interconex with IMS. We find that Lemire suggested and was aware of the Teaming Agreement with IMS. Lemire was in contact with both Thom and Stephens around the time the Teaming Agreement was signed. The bid proposal that IMS submitted to Raymes specifically referred to Interconex as the shipper, and we find it incredible that Lemire, as manager of the procurement division, would not have read the bid before awarding the contract to IMS. Moreover, because of his relationship with Stephens, *402 we cannot believe that Lemire was unaware of how Interconex came to be a part of the IMS bid. Finally, as discussed below, Lemire had an independent business relationship with Stephens and stood to benefit if Interconex provided shipping services to Raymes. At approximately the same time the 220 Home Contract was awarded, Lemire's division received requests from Carver to purchase three and four bedroom houses and 90 units of "bachelor quarters" for use at "Rayville," a Raytheon installation in Saudi Arabia. The requests were again urgent and Waxman thus requested bids only from vendors with whom Raytheon had dealt previously. IMS again submitted the lowest responsive bid and was awarded the contracts (hereinafter collectively referred to as the "Special Shipment Contract"). [3] On September 1, 1976, IMS entered into a transportation agreement with Interconex pursuant to which Interconex would arrange to ship the houses and bachelor quarters to Saudi Arabia in a single shipment. Generation *403 Holdings
Immediately after IMS received the 220 Homes Contract award from Raymes, Thom met again with Stephens. At Stephens' request, the shipping agreement between IMS and Interconex was divided into two parts. IMS entered into one agreement with Interconex and a second agreement with Generation Holdings, Ltd. ("Generation Holdings"), a Liberian company with its office at Geneva, Switzerland. The shipping services agreement between IMS and Generation Holdings was dated June 7, 1976, but signed a few weeks later. Thom signed on behalf of IMS and Louis Isaacs [4] signed on behalf of Generation Holdings. Payments for transportation services were made separately to Interconex and Generation Holdings. Generation Holdings was formed in or about 1974 on behalf of Lionel Achuck for use in his international business dealings. Pierre de Charmant, a Swiss attorney, formed Generation Holdings and, by holding all of its bearer shares, was the technical owner of the corporation. Achuck had power of attorney over the corporation *404 which enabled him to instruct de Charmant to act for Generation Holdings on his behalf. Stephens did not have a power of attorney over Generation Holdings but nonetheless caused Generation Holdings to enter into the shipping agreement with IMS without Achuck's knowledge. [5] Stephens subsequently told Achuck that he had used Generation Holdings to enter into the contract with IMS rather than using Coralda Trust Reg., a Swiss corporation over which he had the power of attorney, because the name Generation Holdings sounded more like a shipping company. The original agreement between IMS and Interconex provided for shipment of 220 houses in three sailings at a cost of $ 20.50/square foot payable to Interconex. As a result of the new agreements between IMS and Interconex and IMS and Generation Holdings, the houses were to be delivered in three shipments at a cost of $ 12.65/square foot payable to Interconex and $ 7.85/square foot payable to Generation Holdings. The Special Shipment Contract provided for *405 delivery in one shipment at a cost of $ 12.65/square foot payable to Interconex. No transportation agreement between IMS and Generation Holdings providing for services under the Special Shipment Contract was offered into evidence, but because Generation Holdings received payment for the shipment, it appears that such an agreement, perhaps oral, existed. Generation Holdings received $ 775,000 for the shipment of homes under the Special Shipment Contract and $ 678,240 for each of two sailings under the 220 Homes Contract. As a result of an internal investigation at Raytheon, see infra,Interconex and IMS cancelled their agreements on January 6, 1977. Raymes took over the final sailing under the 220 Homes Contract. Generation Holdings thus received a total of $ 2,131,480 from IMS for the three shipments. Generation Holdings, however, performed no services under its contract with IMS. Thom was told that Generation Holdings would take care of "greasing the way," if necessary, to get the shipments through the Saudi Arabian port expeditiously and to arrange whatever documentation was necessary. Its services, however, were not needed. [6] Generation Holdings thus had no expenses, *406 and the money it received was entirely profit. Stephens and Richard Davies, the attorney who signed the shipping agreement between Generation Holdings and IMS under the name Louis Isaccs, caused the payments received from IMS under the shipping agreement to be deposited in Generation Holdings' account at Credit Suisse in Geneva, Switzerland.
"Joint Ventures"
Prior and subsequent to the Triad contract, Lemire and Carver were searching for business opportunities in the Middle East and particularly Saudi Arabia in their individual capacities. Stephens was also seeking business opportunities on behalf of Interconex. Carver and Lemire testified that they were involved in a joint venture with Stephens and Achuck beginning in 1976 to construct a modular housing factory in Saudi Arabia. Stephens and Achuck denied *407 that any joint venture existed. Beginning around 1975, Carver, Stephens and Lemire discussed building a factory in Saudi Arabia to produce modular homes for sale to private entities and to the Saudi government. They also discussed shipping prefabricated housing from Europe or the United States to Saudi Arabia. In connection with that proposal, Lemire and Stephens visited a housing company in Colorado but ultimately concluded that the inland transportation costs would make the project economically unsound. As part of their plans, Carver, Lemire and Stephens hoped to supply the housing needs associated with the Triad contract between Raytheon and the Saudi Arabian government. At the last minute, however, the Saudis demanded that Raytheon provide the housing as part of the Triad contract. After the Saudis decided to include the housing needs for the Triad missile base in their contract with Raytheon, Stephens met with Lemire and Carver. At that meeting, Stephens testified, the three devised a plan for obtaining a share of the profits from the housing even though Raytheon was supplying the housing directly to the Saudi government. Lemire suggested that Interconex enter into a *408 teaming agreement with a potential housing supplier because it could not bid directly on the transportation portion of the contract. Stephens, on behalf of Interconex, then entered into the Teaming Agreement with IMS. Stephens described the Teaming Agreement as fulfilling two purposes. First, the shipping agreement between Interconex and IMS allowed Interconex to profit from the shipment of housing to Saudi Arabia. Second, the IMS/Generation Holdings shipping agreement allowed Stephens to direct a portion of the revenue from the housing shipments to Generation Holdings. Stephens stated that he, Carver, and Lemire agreed in June 1976 to split the proceeds flowing to Generation Holdings with 50 percent going to Carver and Lemire and 50 percent to Stephens and Achuck. Lemire and Carver denied that there was ever any agreement to divide profits from the 220 Homes Contract and the Special Shipment Contract. Lemire and Carver also denied any knowledge of Generation Holdings or its connection with the contracts. We have already found that Lemire suggested to IMS and Interconex that they enter into a Teaming Agreement. We also accept Stephen's testimony that he, Achuck, Lemire *409 and Carver planned to divide the excess profits from the 220 Homes Contract. It does not follow, however, that Lemire and Carver necessarily knew of the existence of Generation Holdings or of its role in diverting funds to Geneva. Regardless of whether Lemire and Carver knew that Generation Holdings was the immediate source of the funds received from Stephens (see infra), they knew that Raytheon was the ultimate source of those funds. The revenue that Generation Holdings received as a result of its shipping agreement with IMS, totalling $ 2,131,480, was deposited at Credit Suisse in Geneva. The first disbursement from the Generation Holdings account took place on October 4, 1976, when Stephens, Carver and Achuck met in Geneva. Carver wanted to form a company to hold the money that Stephens was going to transfer to him and to Lemire, and Stephens and Achuck knew attorneys in Geneva who could help him do so. Achuck introduced Carver to a Swiss attorney, Rene Mezger. Mezger formed Redcon Establishment, a Liechtenstein company with its office at Geneva, Switzerland, on Carver's behalf. Redcon Establishment was a bearer share corporation and Mezger and his associates held *410 the shares. Carver had a power of attorney and could direct disbursements from Redcon Establishment. Immediately after Redcon Establishment was formed, Carver and Achuck went to a Swiss bank where Carver opened a safety deposit box in the name of Redcon Establishment. While Carver and Achuck were involved with the formation of Redcon Establishment, Stephens had checks drawn on the Generation Holdings account in the name of Redcon Establishment. He also withdrew currency in the form of Swiss francs from the account. Later that day, Carver, Stephens, Achuck and Mrs. Carver met in the Carvers' hotel room. Stephens gave Carver checks totalling approximately $ 300,000 and Swiss francs worth $ 200,000. Because the banks were already closed, Carver put the checks and cash in the hotel's safe overnight and placed the checks in Redcon Establishment's safety deposit box the next day. After leaving Geneva, Carver met with Lemire in Rome. Carver told Lemire that he had opened an account to hold funds for use in their business ventures in Saudi Arabia and that $ 500,000 had been turned over to them by Stephens. Carver and Lemire characterized the funds in the Redcon Establishment *411 account as capital contributions by Stephens and Achuck for use in various joint ventures in Saudi Arabia. They testified that Stephens, Achuck and they were all involved in the joint ventures, although Achuck's role was more that of a silent partner than an active participant, and that Stephens and Achuck provided all of the capital and they provided all of the services. Stephens and Achuck denied that they were involved in any joint ventures with Carver and Lemire. Stephens conceded discussing various business plans with Lemire and Carver but said that none of them got off the ground or went far enough to be considered a joint venture. We find that there was a business relationship among Lemire, Carver, Stephens and Achuck but do not need to decide whether that relationship constituted a "joint venture." Regardless of the nature of the parties' business relationship, the money Lemire and Carver received from Stephens was a share of the profits from the 220 Homes Contract and the Special Shipment Contract that the parties had agreed to share. Perhaps it was intended for subsequent use as a capital contribution, but its character as profit to Lemire and Carver from their fraud *412 on Raytheon is clear. Stephens made additional transfers of funds from the Generation Holdings account to Redcon Establishment in 1977 pursuant to the agreement among Carver, Lemire, Stephens and Achuck to share the profits from the IMS/Generation Holdings transportation agreements. The total amount transferred was approximately $ 1 million. The Funds in the Generation Holdings account that were not transferred to Redcon Establishment were transferred to an annuity in Bermuda for the benefit of Stephens and Achuck. No documentation was ever prepared in connection with the transfer of funds to Redcon Establishment. Lemire and Carver characterized the payments as capital contributions for which no loan documentation would be required but at another point Lemire contradicted himself by stating that there was an unwritten agreement to repay Stephens. Stephens testified that he never expected to be repaid and we find that the funds were not intended to be loans.
Cayman Islands Accounts
Carver and Lemire used part of the money in the Redcon Establishment account on various business ventures. [7] Most of it, however, was moved to two companies in the Cayman Islands for tax *413 and secrecy reasons. The Cayman Islands have no income tax and have bank secrecy laws similar to those in Switzerland. Lemire and Carver created accounts in the Caymans to take advantage of the secrecy laws. All of the funds deposited in the Cayman Islands came from Stephens through Redcon Establishment. Lemire travelled to the Cayman Islands in May or June 1977 to form a company called International Resource Management Consultants, Limited ("IRMC"). Lemire met with Derek Harold Mitchley Price, whose company provided a registered office and staff for Cayman Islands companies. Price established IRMC as a bearer share company with himself and a secretary from his office serving as the directors and Lemire and Carver holding the shares. IRMC had a bank account in the Cayman Islands over which Price had sole signatory authority. Lemire had the power to instruct Price to act on behalf of IRMC. Lemire put a small amount of money into the IRMC account at the outset. On June 28, 1977, he sent an additional $ 200,000 for deposit in the account. The $ 200,000 came from Redcon Establishment. On Lemire's *414 instructions, Price formed a second company in August 1977 called Redcon Limited. Redcon Limited was also a bearer share company and had the same directors and ownership as IRMC. On November 7, 1977, Lemire delivered three checks totalling $ 500,000 to Price for deposit in Redcon Limited's account. The deposit included the checks that Stephens gave Carver in Geneva in October 1976 and which had been in Redcon Establishment's safety deposit box in Geneva. Lemire also asked Mrs. Carver to wire funds from Redcon Establishment to IRMC. At her request, he sent her written instructions on how to do so because she did not speak English well. Mrs. Carver then wired two additional checks, one in the amount of $ 50,000 and the other for $ 44,000 from Redcon Establishment to Price for deposit in IRMC's account. On Lemire's instruction, Mrs. Carver also withdrew $ 50,000 from the Redcon Establishment account which she kept to cover her living expenses. Lemire deposited a total of $ 794,000 in the Cayman Islands accounts. Carver knew Lemire was opening accounts in the Cayman Islands but testified that he was not aware of any details concerning the accounts and did not think it important *415 to find out despite the large amounts of money ultimately deposited there. He also could not explain why it was necessary to transfer money from Redcon Establishment to the Cayman Islands. IRMC was established to receive commissions from a construction contract that Carver and Lemire [8] entered into with an Italian company, Cassini International ("Cassini"). Cassini had a prefabrication plant in Saudi Arabia. Cassini received a $ 200 million contract from the Saudi government in July 1977. Pursuant to a contract that Carver and Lemire entered into with Cassini in London, Carver, Lemire, Stephens and Achuck were to receive a 4-percent commission on the Saudi Arabian project. Lemire and Carver thus expected to receive $ 8 million dollars to split with Stephens and Achuck and which would be deposited in the Cayman Islands to evade United States income tax. The Cassini deal, however, fell through because Carver was forced to resign from Raytheon and leave Saudi Arabia in a hurry in August 1977. [9]
*416 All of the money deposited in the Redcon Limited account came from Redcon Establishment. Carver gave Lemire checks which Lemire carried to the Cayman Islands for deposit. All of the money was to be used to set up a housing factory in Saudi Arabia. The factory, however, was never built and the Redcon Limited account was consolidated with the IRMC account in 1978. Lemire transacted business in the Cayman Islands under the name Jack Milhouse. Lemire first used the name Milhouse in the Cayman Islands in May 1977 when IRMC was incorporated. Jack Milhouse is the name on file with the government of the Cayman Islands as owner of the corporation. Milhouse was also the registered owner of Redcon Limited. Lemire used an alias in conducting business in the Cayman Islands to avoid detection by the Internal Revenue Service and by the Saudi Arabian prince. Between 1977 and 1979 Lemire made several withdrawals from the Redcon Establishment, IRMC and Redcon Limited accounts totalling $ 180,000. For each withdrawal from IRMC and Redcon Limited, Lemire had to sign a loan, but the companies later were dissolved, and none of the money was ever repaid. As previously found, $ 50,000 from Redcon *417 Establishment went to Mrs. Carver to cover her living expenses. In addition, Lemire sent $ 80,000 from the Cayman Islands accounts to Carver to cover his expenses in Saudi Arabia. The remaining $ 50,000 was withdrawn from the Cayman Islands companies. Lemire claimed to have used part for business expenses and admitted converting approximately $ 35,000 for his personal use. A total of $ 844,000 was transferred from Generation Holdings to Redcon Establishment in 1976 and 1977. In 1977, Carver and Lemire transferred $ 500,000 from Redcon Establishment to Redcon Limited. Also in 1977, Carver and Lemire transferred from Redcon Establishment $ 294,000 to IRMC and $ 50,000 to Mrs. Carver for her personal use. Thus, a total of $ 794,000 was ultimately transferred from Redcon Establishment to the Cayman Islands and an additional $ 50,000 was converted to Mrs. Carver's personal use. Respondent determined that Carver and Lemire each received $ 1,049,000 from Stephens out of the Generation Holdings account. Stephens' testimony supports only the receipt of a total $ 1,049,000. The record also supports only a finding that Carver and Lemire together received little more than $ 1 million. *418 Carver and Lemire admitted that Stephens transferred approximately $ 900,000 to them in Geneva. Carver also admitted receiving between $ 150,000 and $ 165,000 from Stephens at a bank in Al Khobar. We find that Stephens transferred approximately one-half of the $ 2,131,480 received as a result of the contract between IMS and Generation Holdings to Carver and Lemire, and thus find that Carver and Lemire together received a total of $ 1,049,000, $ 705,000 in 1976 and the balance of $ 344,000 in 1977.
Raytheon Investigation
Because the Saudis' housing requirement for the Triad contract was urgent, the standard procurement policies were not followed. The 220 Homes Contract was awarded to IMS on June 28, 1976, although a written requisition for the housing was not received until June 29, 1976. In addition, Lemire signed the contract, thus legally binding Raytheon, without obtaining the prior corporate approval required on a contract of that value. The Special Shipment Contract was awarded and signed in the same manner but, upon subsequent review, was not approved by higher corporate officials. In 1975, Raytheon management issued a directive that all shipping on Raytheon *419 contracts be handled by Behring International. Behring was to act as freight forwarder and to negotiate steamship rates. The reason for using a single freight forwarder was that Raytheon could obtain better rates for large volume shipments. Interconex was also considered as a freight forwarder but at the meeting at which Behring was selected, Lemire's division cast the only vote against Behring and in favor of Interconex. The directive requiring the use of Behring was apparently mandatory only when Raytheon was shipping items and applied only to break bulk shipments. Thus, Lemire and Waxman concluded that if a subcontractor such as Interconex rather than Raytheon handled transportation, the directive would not apply. In 1976, all procurements in excess of $ 10,000 required a summary of award for the contract file. After the 220 Homes Contract was awarded, Waxman prepared a summary of the award to IMS for Raytheon's files. Attached to the summary were copies of the various proposals. IMS's proposal dated June 21, 1976, indicated its intent to use Interconex as the shipper. A procurement review form was also forwarded to Raytheon's corporate headquarters for review. The summaries *420 and review form indicated that IMS submitted the lowest responsive bid. Waxman also prepared summaries and procurement review forms for the Special Shipment Contract award. Francis W. Ramsey was an attorney employed as a corporate manager for Raytheon Corporation in 1976. His job was to review large subcontracts. Lemire was supposed to obtain Ramsey's review prior to executing and releasing a subcontract. If he failed to do so, as he did with the subcontracts awarded to IMS, however, the contracts were nonetheless legally binding on Raytheon. Ramsey agreed with Lemire that corporate policy did not require use of Behring. In fact, he could not remember whether he had heard of the Behring directive. Ramsey reviewed the 220 Homes Contract in July 1976. [10] He based his review on materials that Waxman brought him, consisting primarily of spread sheets. Ramsey did not review the original bid documents. The spread sheets indicated that only IMS submitted a responsive bid. Ramsey was not satisfied with the information he received, and although he believed that the Behring directive was not necessarily binding, he was concerned that the subcontractor was providing transportation because *421 Raytheon generally provided its own transportation. He approved the contract and took no further action, however, because the contract had already been let. Ramsey reviewed the Special Shipment Contract in September 1976. Waxman again brought him contracts and a spread sheet showing prices. As had the 220 Homes Contract, the Special Shipment Contract had already been let without seeking Ramsey's approval. Again Ramsey found that only IMS had bid responsively. He was concerned about the quoted costs for both the housing and the transportation and discussed his concerns with Lemire. Lemire told him that there had been a mark up on the housing prices because IMS was a highly respected group of architects who specialized in building homes for Saudi Arabian use. Lemire had previously told Ramsey that IMS was a highly efficient automated factory that would be able to meet urgent delivery dates. When Ramsey confronted Lemire with his previous statements, Lemire said he previously thought that IMS was a factory. Ramsey also asked Lemire who the shipper was. Lemire said he *422 did not know and would not find out because it was IMS's responsibility, not Raytheon's. Ramsey found out later that day from Waxman that the shipper was Interconex. Lemire knew at the time he awarded the contract that Interconex would provide for transportation. After learning that Interconex was the shipper, Ramsey spoke to James Welty and Ralph Driscoll in Raytheon's transportation department and asked them to find out how much the charter had cost. Within 20 minutes, Welty and Driscoll discovered that there was an estimate on the special shipment of $ 48 per ton, whereas the IMS contracts provided for transportation costs of $ 102 per ton. Ramsey sent a memorandum detailing his findings to Lemire on October 25, 1976. Lemire responded that he had actually saved the company money because if Raytheon had shipped the houses, it would have had to do so under the company-wide agreement with Behring. Behring charged $ 164 per ton. Ramsey argued that Raytheon would have chartered a ship for shipments of this size, and the Behring directive applied only to break bulk shipments, which are always more expensive than charters. Although Raytheon had never chartered a ship before, *423 the Behring directive did not preclude them from doing so. Lemire nonetheless maintained, and continued to maintain at trial, that he had saved the company money. On November 8, 1976, Ramsey, Welty, Lemire and others attended a meeting at Raytheon's corporate headquarters to discuss the IMS subcontracts. Welty had obtained estimates of shipping costs from Behring and information on Interconex's costs from the Federal Maritime Commission and reconstructed what a shipment should have cost. He discovered that Raytheon could save $ 700,000 per voyage by handling the shipments itself. At that time two voyages had been completed and the third was imminent. Lemire stated that he did not think Raytheon would be able to take over the third sailing but would work for the fourth. Raytheon eventually took over the final shipment and saved $ 700,000. The day after the meeting Lemire tendered his resignation, stating that he wanted to devote himself to his other business endeavors. [11]
*424 The Criminal Proceedings
In September 1981, Carver, Lemire, Achuck, Stephens and Interconex were indicted in the United States District Court for the District of Columbia for violations of 18 U.S.C. §§ 371, 1343, 2314 and 2. The indictments resulted from an investigation of the defendants' roles in the shipment of modular housing to Saudi Arabia under the Triad contract. In December 1982, following a jury trial, Lemire, Stephens, Achuck and Interconex were convicted of four counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2, one count of transportation of the proceeds of fraud in interstate commerce in violation of 18 U.S.C. §§ 2314 and 2, and one count of conspiracy in violation of 18 U.S.C. § 371. The convictions were affirmed by the United States Court of Appeals for the District of Columbia Circuit. [12] Lemire was sentenced to five years imprisonment and fined $ 19,000. Stephens also received a prison term and Achuck was placed on probation. *425 Carver's criminal case was separated from the other defendants. On December 16, 1982, Carver pled guilty under an Alford plea [13] to one count of wire fraud, a violation of 18 U.S.C. §§ 1343 and 2. He was sentenced to three years' imprisonment and fined $ 1,000. On November 24, 1987, we held a hearing on respondent's Motion to Determine the Admissibility of Prior Criminal Judgments and to Determine the Facts Essential to Sustain those Judgments. After due consideration, we issued an Order that the facts essential to sustain the convictions were admissible as evidence in this case but did not collaterally estop the petitioners from introducing conflicting evidence. We found the following facts to be essential to the criminal convictions: 1. Raytheon and IMS entered into two contracts in 1976, in which IMS agreed to manufacture and deliver prefabricated housing to Saudi Arabia. 2. During 1976 and thereafter, *426 Joseph Lemire, Roy Carver, Jon Stephens, Lionel Achuck and Interconex entered into a scheme to defraud Raytheon Corporation of money on the housing contracts entered into between Raytheon and IMS. 3. As part of their scheme to defraud Raytheon Corporation, Joseph Lemire, Roy Carver, Lionel Achuck, Jon Stephens, and Interconex did cause IMS to enter into a separate shipping subcontract with Generation Holdings on the Raytheon-IMS prefabricated housing contracts. 4. A $ 775,008 check payable to Generation Holdings, a subcontractor of IMS on the housing contracts, was stolen, converted or taken by fraud from Raytheon Corporation by Joseph Lemire, Roy Carver, Jon Stephens, Lionel Achuck and Interconex in the course of their scheme to defraud Raytheon Corporation of money. 5. The $ 775,008 check payable to Generation Holdings was part of the proceeds of the shipping aspect of the contract between IMS and Raytheon, which shipping contract would not have been consummated but for the fraud of Joseph Lemire, Roy Carver, Jon Stephens, Lionel Achuck, and Interconex. 6. In 1976, Joseph Lemire, Roy Carver, Jon Stephens, Lionel Achuck, and Interconex defrauded Raytheon Corporation of *427 at least $ 775,008. 7. On or about September 21, 1976, Joseph Lemire, Roy Carver, Lionel Achuck, Jon Stephens, and Interconex for the purpose of executing their scheme to defraud Raytheon Corporation, did cause Jon Stephens to make a telephone call to IMS in which Stephens directed IMS to issue a check to Generation Holdings in the amount of $ 775,008, said amount representing a portion of the proceeds of their scheme to defraud Raytheon. 8. On or about January 7, 1977, Joseph Lemire, Roy Carver, Lionel Achuck, Jon Stephens, and Interconex for the purpose of executing their scheme to defraud Raytheon Corporation, did transmit a telex from the Cayman Islands, British West Indies to IMS in Washington, D.C. in which Generation Holdings purported to release IMS from any remaining obligations on the shipping contract entered into between Generation Holdings and IMS on the Raytheon-IMS housing contracts. 9. On or about January 24 and 26, 1977, Joseph Lemire, Lionel Achuck, Roy Carver, and Jon Stephens, for the purpose of executing their scheme to defraud Raytheon Company, did cause Jon Stephens to make telephone calls to IMS, in which Jon Stephens furthered the efforts of Lemire, *428 Carver, Achuck, Stephens, and Interconex to conceal from the Raytheon Corporation the roles of Interconex Corporation and Generation Holdings in the scheme to defraud Raytheon. 10. That Roy C. Carver received $ 1,049,000 from Jon Stephens as a result of the scheme to defraud Raytheon Corporation, and Roy Carver divided the $ 1,049,000 with Joseph C. Lemire.
The evidence presented at trial does not conflict with the facts set forth in our Order which were admitted into evidence as proof but which we now find as facts. OPINION Respondent contends that petitioners each received $ 1,049,000 in unreported income, $ 705,000 in 1976 and $ 344,000 in 1977, and that the resulting deficiencies in income tax are due to fraud within the meaning of section 6653(b). Absent fraud, the statute of limitations bars assessments and collection of any deficiencies for the years in issue. Section 6501(c). Respondent's deficiency determination is presumed correct, and petitioners bear the burden of refuting it by a preponderance of the evidence. Rule 142(a). [14] The burden of proving fraud by clear and convincing evidence rests on respondent. Section 7454(a); Rule 142(b). *429 Gross income includes all income from whatever source derived. Section 61(a). Lemire and Carver entered into an agreement with Stephens and Achuck to defraud Raytheon of money on the 220 Homes Contract and the Special Shipment Contract between Raytheon and IMS. As a result of that scheme, we have found that Carver and Lemire together received $ 1,049,000. Carver and Lemire admitted receiving approximately $ 1 million from Stephens. They maintained, however, that the money constituted a capital contribution to their joint business ventures, which Stephens and Achuck denied. They offered no evidence, other than their testimony, to show that the money received was not taxable income. [15] While we believe that Lemire and Carver intended that the funds be used in their prospective Saudi Arabian business ventures, we also believe the funds were their share of the proceeds of the fraud against Raytheon and are taxable to them. James v. United States,366 U.S. 213 (1961). *430 In his notices of deficiency, respondent took the protective position that Carver and Lemire each received $ 1,049,000 over two years, $ 705,000 in 1976 and $ 344,000 in 1977, because he did not know how the funds were allocated between them. We find that Carver and Lemire received a total of $ 1,409,000, which they divided evenly. Thus, each of them received $ 352,500 in 1976 and $ 172,000 in 1977. Next we must decide whether any pat of the understatements of income resulted from fraud. Fraud is a factual question to be resolved by an examination of the entire record. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). To establish fraud, respondent must introduce clear and convincing evidence that petitioners acted with specific intent to avoid taxes they knew or believed they owed. Stephenson v. Commissioner,79 T.C. 995, 1005 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Rule 142(b). Respondent need not prove the precise amount of the underpayment attributable to fraud, but only that some part of the underpayment of tax for each year is attributable to fraud. Fraud is never presumed, Beaver v. Commissioner,55 T.C. 85, 92 (1970), *431 but may be proven by circumstantial evidence because direct proof of a taxpayer's intent is rarely available. Stephenson v. Commissioner,79 T.C. at 1005-1006. Petitioners' entire course of conduct must be examined to determine whether the requisite fraudulent intent exists. Solomon v. Commissioner,732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam a Memorandum Opinion of this Court; Stone v. Commissioner,56 T.C. 213, 223-224 (1971). Respondent has proven that Lemire and Carver received at least $ 1 million as a result of their fraud against Raytheon. That money was taxable, but Lemire and Carver did not include it in income. Respondent, therefore, has met his burden of proving by clear and convincing evidence that there were underpayments of income tax for each year. As discussed below, the underpayments were due to fraud. Courts have relied on a number of indicia of fraud in deciding section 6653(b) cases. Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence. Solomon v. Commissioner,732 F.2d at 1461; Beaver v. Commissioner,55 T.C. at 93. *432 First, a failure to maintain adequate books and records may indicate fraudulent intent. Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court, cert. denied 397 U.S. 962 (1970). Dealings in cash also indicate fraud and heighten the negative effect of inadequate recordkeeping. Friedman v. Commissioner,421 F.2d 658 (7th Cir. 1970), affg. per curiam a Memorandum Opinion of this Court; Nicholas v. Commissioner,70 T.C. 1057, 1066 (1978). Third, a taxpayer's lack of credibility, inconsistent testimony or evasiveness on the stand are heavily weighted factors in considering the fraud issue. Toussaint v. Commissioner,743 F.2d 309, 312 (5th Cir. 1984), affg. a Memorandum Opinion of this Court. Fourth, a taxpayer's business experience and knowledge of the tax laws may tend to prove or disprove the existence of fraud. See O'Connor v. Commissioner,412 F.2d 304, 310 (2d Dir. 1969), affg. on this issue a Memorandum Opinion of this Court, cert. denied 397 U.S. 921 (1970). Finally, a taxpayer's dishonesty in business transactions *433 or willingness to defraud others may indicate a willingness to defraud respondent. Afshar v. Commissioner,T.C. Memo. 1981-241, affd. without published opinion 692 F.2d 751 (4th Cir. 1982), cert. denied 461 U.S. 928 (1983). All of these factors are present in this case and convincingly demonstrate that petitioners acted with fraudulent intent. Petitioners maintained no records relating to their alleged joint venture with Stephens and Achuck or of their agreement to split the profits from the transportation agreement between IMS and Generation Holdings. They presented no written evidence of any of their business ventures in the Middle East. In addition, Lemire, Carver, Stephens and Achuck conducted their dealings primarily in cash, and there were no writings evidencing the transfers of funds from Generation Holdings to Redcon Establishment. We did not find Lemire to be a credible witness. He contradicted himself concerning the money received from Stephens, first testifying that it was contribution to capital and later that it was a loan that was intended to be repaid. We also rejected his testimony that he was unaware of the Teaming *434 Agreement between IMS and Interconex and his denial that there was any agreement to split excess profits earned from the transportation agreements with IMS. Carver's testimony also was not entirely credible. We rejected his contentions that there was never an agreement to split profits with Stephens and Achuck. His testimony that Stephens and Achuck, who are experienced businessmen, contributed money for use in a joint business venture without requiring any documentation or requiring Carver and Lemire to account to them for the use of the money is not believable. Further, Carver presented no documentation of any of his business ventures in Saudi Arabia. Lemire was an experienced and sophisticated businessman and had some knowledge of the tax laws. He testified that he opened the Redcon Limited account in the Cayman Islands to receive commissions specifically to avoid Internal Revenue Service scrutiny of the transactions. In addition, he admitted to using the alias Jack Milhouse primarily to avoid detection by the Internal Revenue Service. Lemire's and Carver's dishonesty in their various business dealings is further evidence of fraudulent intent. Both were convicted of defrauding *435 their employer, Raytheon. Lemire lied to his superior, Ramsey, concerning the contracts between Raymes and IMS, stating that he did not know that Interconex was the shipper and describing IMS first as a factory and later as a group of architects. In addition, Carver and Lemire opened accounts in Switzerland and the Cayman Islands to take advantage of bank secrecy laws, to avoid disclosing traces of their fraud on Raytheon, and to avoid respondent's scrutiny. Based on the foregoing, we conclude that Lemire's and Carver's actions evidenced an intent to evade Federal income taxes known to be owing and sustain respondent's additions to tax under section 6653(b) for both of the years in issue. As to Mrs. Carver, however, we find that respondent has not met his burden of establishing fraud. Mrs. Carver was present when Stephens made the first transfer of funds from Generation Holdings to Carver. She also transferred funds from Redcon Establishment to the Cayman Islands and kept $ 50,000 for her personal use. The record indicates, however, that Mrs. Carver did not speak English well. Moreover, there is no evidence to indicate that Mrs. Carver knew that any of the money was taxable. *436 We, therefore, hold that Mrs. Carver is liable for the deficiency determined against Carver because she filed a joint return with him, but that she is not liable for the addition to tax for fraud. Decisions will be entered under Rule 155.
Footnotes
*. Heidrum I. Carver did not appear at the trial. ↩
1. All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. The parties stipulated that Lemire resigned from Raytheon in December 1976. Testimony at trial, however, indicates that he resigned the day after a company meeting held in early November 1976. ↩
3. The date of the Special Shipment Contract award is not in the record. The purchase request forms are dated June 25, 1976, and summaries of the award were prepared on August 23, 1976.↩
4. Louis Isaacs is a fictitious person. An attorney, Richard Davies, signed the contract on behalf of Generation Holdings using the name Louis Isaacs. ↩
5. de Charmant was aware that Achuck and Stephens were partners and apparently believed that Achuck intended for both of them to have power of attorney over Generation Holdings. ↩
6. We do not believe that the parties ever intended for Generation Holdings to provide any assistance in getting the shipments through port in Saudi Arabia. Carver testified that he had a lot of influence with a Saudi Arabian prince and was able to ensure that shipments moved through port expeditiously. There was thus no need for Generation Holdings to do so. ↩
7. The record does not indicate the exact amount used on these ventures. ↩
8. Stephens testified that he had heard about the project but did not participate in it. ↩
9. Carver's apartment in London was under surveillance for a three-month period in 1977. Mrs. Carver was living in the apartment at the time. Her phone was tapped and her mail opened. In August 1977, a Saudi prince brought Carver to his office and played the tapes of phone conversations to him. He had previously played the same tapes to the president of Raytheon and demanded that Carver be removed from Saudi Arabia. It is not clear what the tapes revealed, but Lemire testified that the prince was to receive an eight percent commission on the Cassini contract and did not know (apparently until he listened to the tapes) that Carver and Lemire were also taking a share of the profits. ↩
10. Lemire had mentioned the contract to Ramsey in June but did not request his approval at that time. ↩
11. Just before leaving Raytheon, Lemire had formed a consulting company in New Hampshire called international Business Management Consultants ("IBMC"). Lemire and Carver planned to use the company to pursue business interests in Saudi Arabia. Stephens arranged for IBMC to receive a one-year consulting contract with a Cayman Islands company in the amount of $ 48,000. Lemire received two $ 4,000 payments on the contract.↩
12. United States v. Lemire,720 F.2d 1327 (D.C. Cir. 1983), cert. denied 467 U.S. 1226↩ (1984). 13. North Carolina v. Alford,400 U.S. 25 (1970). Under an Alford↩ plea, a defendant pleads guilty without admitting guilt based on an acknowledgment that the prosecution has sufficient evidence to assure his conviction. 14. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
15. Petitioners argue that because of the difficulties inherent in proving a negative, i.e., that they did not receive income, we should shift the burden of proving the correctness of the deficiency to respondent. Petitioners cite cases in which courts have considered shifting the burden of going forward. These cases, however, involve assessments with no rational basis, so-called "naked assessments." Some courts will shift the burden of going forward to respondent if the taxpayer introduces some evidence that the assessment or deficiency asserted is arbitrary or excessive. See Helvering v. Taylor,293 U.S. 507 (1935); see also United States v. Janis,428 U.S. 433, 441-442↩ and nn. 9 and 10 (1976). In the instant case, there is an abundance of evidence supporting respondent's deficiency determination, and petitioners have presented no convincing evidence that the deficiency is wrong. Thus, this is not a case in which a shift in the burden of going forward is warranted.