T.C. Memo. 1997-496

UNITED STATES TAX COURT

LEONARD RAY BLANTON AND BETTY BLANTON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2007-85.                    Filed November 5, 1997.

<u>D. Bruce Shine</u>, and <u>Donald F. Mason, Jr.</u>, for
petitioners.

<u>Robert J. Misey, Jr.</u>, and <u>John Lancaster</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined a $10,078 deficiency in
petitioners' joint Federal income tax for 1978 and a $7,586
addition to tax for fraud pursuant to section 6653(b)[1].

---

[1]    All section references are to the Internal Revenue Code in
                                             (continued...)

After concessions,[2] the issues for decision are: (1)
Whether income petitioner reported as a sale of a partnership
interest was really ordinary income in the form of a $15,000
finder's fee paid to petitioner for using his influence to assist
a constituent in procuring a construction loan. We hold it was.[3]
(2) Whether petitioner is liable for the section 6653(b) fraud
addition to tax for 1978. We hold he is.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.
The stipulated facts and accompanying exhibits are incorporated
into our findings by this reference. Petitioners resided in
Adamsville, Tennessee, at the time of filing their petition in
this case. Hereinafter, the term "petitioner" refers to Leonard
Ray Blanton.

---

[1](...continued)
effect for the year in issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure, unless otherwise
indicated. All dollar amounts are rounded to the nearest dollar,
unless otherwise indicated.

[2]     On brief, respondent concedes that Betty Blanton qualifies
as an innocent spouse, and therefore she is not liable for any
deficiency for 1978.

[3]     We note that in Blanton v. Commissioner, 94 T.C. 491 (1990),
(Blanton I) we granted partial summary judgment to respondent in
the instant case, holding that petitioner is collaterally
estopped from denying that in 1978 he received income of
$23,334.50 from liquor license sales in violation of the Hobbs
Act, 18 U.S.C. sec. 1951 (1976). Accordingly, we need only
address whether petitioner received and erroneously reported the
$15,000 loan finder's fee for the taxable year in issue.

## Background

For the taxable year 1978, petitioners timely filed a joint Federal income tax return, Form 1040, showing total income of $57,560. On March 26, 1980, petitioners filed an amended 1978 Federal income tax return, Form 1040X, showing an additional $38,334.50 received as the gross sale price for an interest in an oil and gas partnership. After other adjustments, petitioners' income increased by $11,914 therefrom.

On October 29, 1984, respondent issued a notice of deficiency to petitioners, which recharacterized the $38,334.50 as ordinary income. Respondent claims that the $38,334.50 is actually the sum of a $15,000 finder's fee petitioner received for assisting a constituent in procuring a construction loan and a $23,334.50 fee for assisting the same constituent in procuring a liquor license. Respondent also asserted an addition to tax for fraud.

## Petitioner

From January 1975 through January 1979, petitioner was the Governor of the State of Tennessee. Prior to being elected Governor, he served as a member of the Tennessee legislature and the U.S. House of Representatives. For the taxable year in issue, petitioner was married to Betty Blanton (Mrs. Blanton). Sometime after July 1984, petitioner and Mrs. Blanton were divorced.

Petitioner herein was the defendant in the criminal case of United States of America v. Leonard Ray Blanton, et al., Crim. No. 80-30253 (M.D. Tenn., 1981), which was docketed in the U.S. District Court for the Middle District of Tennessee. In March 1981, a Federal grand jury in the Middle District of Tennessee returned an 11-count[4] indictment against petitioner, his assistant, Clyde Edward Hood, Jr., and a third defendant for conspiracy, mail fraud, and violation of the Hobbs Act, 18 U.S.C. sec. 1951 (1976).[5] Petitioner was found guilty on all 11 counts and was sentenced to a concurrent 3-year prison term and fined $1,000.[6]

Thereafter, the Supreme Court decided McNally v. United States, 483 U.S. 350 (1987), wherein it held that mail fraud prohibits only schemes intended to deprive victims of property such as money and not schemes intended to deprive victims of intangible rights such as the right to honest Government. Based

---

[4]    The grand jury originally returned a 13-count indictment against petitioner. The last two counts, which charged petitioner alone with income tax evasion and filing a false tax return, were severed from the other 11 counts and were subsequently dismissed. See Blanton I, supra at 492.

[5]    More specifically, petitioner was indicted for unlawfully, willfully, and knowingly obstructing, delaying, and affecting interstate commerce by extorting $23,334.50 from Jack Ham (Ham), a constituent, representing 20 percent of the profits of a retail liquor store which Ham agreed to pay petitioner in return for petitioner's assistance in procuring the liquor license.

[6]    For a complete discussion of this issue see Blanton I.

on that decision, petitioner moved to have his conviction set aside. In January 1988, the U.S. District Court for the Middle District of Tennessee issued a memorandum opinion in which it applied the McNally decision retroactively and held that petitioner was entitled to have his mail fraud and conspiracy to commit mail fraud convictions dismissed. The District Court, however, left petitioner's conviction for violating the Hobbs Act and conspiracy to violate the Hobbs Act, undisturbed.

Petitioner's Outstanding Oil and Gas Partnership Loans

In early 1976, petitioner called Ed Nelson (Nelson), the president of Commerce Union Bank (Commerce Bank or the bank) to discuss the possibility of financing an oil and gas limited partnership interest (South Texas Drilling or the oil partnership). On April 28, 1976, Commerce Bank lent petitioner $20,000 to finance his acquisition of a 2.4-percent interest in the oil partnership, with the partnership interest as collateral. On June 24, 1976, after oil was discovered, Commerce Bank made petitioner a second loan of $18,353 for the completion of the wells.

In 1976, the wells produced in excess of 100 barrels a day, but soon thereafter production rapidly declined to only 10 to 15 barrels a day because the formation was not sufficiently permeable to let the oil flow through.

In 1976, petitioner's share of the oil partnership, as listed on his Schedule K-1, lost $7,324. That year interest accrued on the $20,000 bank loan of $637 and petitioner paid $363. On the $18,353 bank loan, $386 of interest accrued and petitioner paid $344.

In 1977, during an audit of petitioner's 1974, 1975, and 1976 returns, petitioner told Internal Revenue Service (IRS) Agent Terry McGehee (Agent McGehee) that the oil well was dry and that he thought he was going to lose his whole investment.

In 1978, petitioner's share of the oil partnership, as listed on his K-1, earned only $1,009. That year interest accrued on the $20,000 bank loan of $1,742 and on the $18,353 bank loan of $1,553.

From 1976 through 1978, petitioner had difficulty repaying the bank loans because the income from the oil wells, $100 to $200 a month, was insufficient to service petitioner's debts. In 1977 and 1978, the checks did not even cover interest, and as a result petitioner's bank debt grew.

Jack Ham[7]

In the 1970's, Jack Ham was in the construction business. He became acquainted with petitioner through his construction work and was a major contributor to petitioner's gubernatorial

---

[7] Jack Ham died before trial.

campaign. Prior to the election, petitioner met with him and asked for his political support in the upcoming campaign. Jack Ham told petitioner that he could count on his vote. Thereafter, he donated $1,000 to petitioner's campaign. Petitioner discovered that in addition to contributing the $1,000, Jack Ham and approximately 16 other constituents, had co-signed a note for $50,000, which went to petitioner's campaign. Moreover, Jack Ham personally lent the campaign $25,000. After petitioner's inauguration, Jack Ham visited petitioner in his office at the State Capitol Building (the Capitol) and the Governor's Mansion.

### James Bertram Ham

James Bertram Ham (Bert Ham) is the nephew of Jack Ham (collectively the Hams). During the year in issue, Bert Ham was in the construction business. He and a partner owned Redi-Built Products, Inc. (Redi-Built), a general contractor that built primary and multifamily housing. Bert Ham was Redi-Built's president.

### Clyde Edward Hood, Jr.[8]

When petitioner ran for Governor, Clyde Edward Hood, Jr. (Hood) was his finance chairman for the State of Tennessee, and after his election Hood served as petitioner's assistant. Petitioner and Hood not only were comrades, but Hood was "like a

---

[8] Clyde Edward Hood, Jr. died before trial.

son" to petitioner. Hood and the Hams were the three participants in a State-sponsored, low-income housing project in Jackson, Tennessee, known as the Royal Arms Apartment project (the Royal Arms or the project).

The Royal Arms Apartment Project

In late 1977, the Tennessee Housing Authority (THA) was going to provide permanent financing for construction of the Royal Arms. The Hams submitted a construction proposal for the project to the THA, which was approved in the early part of 1978. Accordingly, Redi-Built would be the general contractor on the project. Although the THA provided the permanent financing for the project, the Hams had to provide their own construction financing of $2.5 million.

During that time, the banking industry nationwide was charging interest rates on loans of up to 14 percent. The State of Tennessee, however, had set a restrictive cap on interest rates, proscribing banks from making intrastate loans at an interest rate exceeding 10 percent. As a result, Tennessee banks were reluctant to make intrastate loans at 10 percent, knowing that they could go out of State and charge rates as high as 14 percent. Given the industry climate, the Hams found it difficult to obtain the necessary construction financing. Jack Ham, to no avail, even offered to pay a man at Merrill Lynch a $15,000 finder's fee if he could help the Hams obtain a construction

loan.  Although Commerce Bank made construction loans, Jack Ham did not think it would lend him money because of some problems with the bank in earlier years.

After being turned down for a loan by various banks, Jack Ham discussed his predicament with Hood, who suggested that he speak with petitioner about the matter.  Thereafter, he and Hood met with petitioner and offered him a finder's fee if he could assist Jack Ham in procuring the $2.5 million construction loan for the Royal Arms project.  Sometime thereafter, the Hams and Hood met at the Capitol to discuss the construction loan's progress.  During that meeting, Hood telephoned petitioner regarding the lack of results the Hams had in getting the construction loan.  Petitioner, understanding that time was of the essence, said that he would call Nelson at Commerce Bank to discuss the matter.  Petitioner concedes that he indeed spoke with Nelson regarding the construction loan for Jack Ham.  During the conversation, Nelson told petitioner to have Jack Ham call the bank's construction lending department.

After speaking with petitioner, Nelson contacted Chris McDonald (McDonald), who was in charge of construction lending for the bank.  Nelson told McDonald about the conversation he had with petitioner and asked McDonald "if he wanted to make a construction loan."   McDonald replied affirmatively, whereby Nelson responded "if it is a good loan, and you would like to

make it; make it."  Shortly thereafter, Jack Ham telephoned Nelson, who referred him to McDonald.  In late August 1978, Commerce Bank approved the construction loan.  For petitioner's assistance in procuring the loan, Jack Ham believed he owed a finder's fee.

When later interviewed by respondent's agents, petitioner denied having played any role in helping Jack Ham and his associates obtain the $2.5 million in financing for the Royal Arms project.

The Oil Partnership Sale Scheme

Before petitioner left office in January of 1979, he needed to pay off his oil partnership debt at Commerce Bank because he and Mrs. Blanton wanted to buy a house in Nashville.  They did not have enough money for a downpayment, and petitioner knew that in order to sign a note for the entire purchase price of a house he "would have to lower [his] liabilities."

Sometime in the fall or winter of 1978, petitioner contacted Jack Ham, who owed him money for the liquor license and the construction loan finder's fee.  Petitioner told him that he could have the oil partnership interest if he paid off approximately $38,000 in debt that petitioner owed Commerce Bank. Jack Ham agreed.

Jack Ham had previously invested in oil wells.  As he indicated, however, during a deposition taken before petitioner's

criminal trial, he did not investigate the oil partnership as he would have investigated a regular investment because he "did not consider it an investment." Rather, he purchased the interest "for one reason, and that was to clear [his] debt" with petitioner. He never asked petitioner the value of the oil partnership interest; however, he thought it to be worthless because South Texas Drilling had no intention of improving its operations, and there had been no checks coming in on the wells for quite some time.

In late 1978, petitioner again called Nelson at Commerce Bank and told him that he wanted to pay off his bank debt because the "interest was eating him alive". Petitioner indicated that he had found someone to purchase his interest in the oil partnership. Nelson was pleased because the cash-flow from the oil wells was not sufficient to service the debt, and therefore the bank was concerned about the loan's stability.

On November 20, 1978, Jack Ham met with James D. Harris (Harris), a commercial loan officer and vice president at Commerce Bank. Jack Ham told Harris that he and petitioner were close friends, that he owed petitioner some favors, and, that he along with some other friends of petitioner, wanted to see petitioner's debt at the bank cleared up before petitioner left office. Jack Ham, who knew the debt was around $38,000, told Harris that he and Redi-Built, his nephew's company, would like

to pay off the total obligation and that they would be ready to go through with the transaction on December 4, 1978. Jack Ham agreed to pay both principal plus accrued interest, which on December 4, 1978, would total $38,334.50.

Henry Hooker (Hooker), an attorney, who also was a limited partner in South Texas Drilling, was responsible for preparing two separate assignments of partnership interest, one from petitioner to Jack Ham, and the other from petitioner to Redi-Built for purchase prices of $23,334.50 and $15,000, respectively. The $38,334.50 total purchase price was paid with two checks, each made payable to Commerce Bank for the above stated amounts. Pursuant to the transfer, Jack Ham and Bert Ham received an interest of 60.87 percent and 39.13 percent, respectively of petitioner's 2.4 percent interest in South Texas Drilling. Upon receiving the two checks, Commerce Bank used the funds to retire petitioner's outstanding oil partnership debt.

On December 27, 1978, Jack Ham assigned his interest in South Texas Drilling to Bert Ham for $334.50. Jack Ham had previously told Harris that he would resell the oil partnership interest to Bert Ham prior to the end of the year at a loss for tax purposes.

Petitioners failed to report the receipt of the $38,334.50 in 1978 on their original Form 1040. On March 26, 1980, petitioners filed an amended 1978 Federal income tax return, Form

1040X, reporting the $38,334.50 as the gross sales price received on disposition of the interest in South Texas Drilling.

OPINION

Issue 1. Whether Income Petitioner Reported as a Sale of a Partnership Interest Was Really Ordinary Income in the Form of a $15,000 Finder's Fee Paid to Petitioner for Using His Influence to Assist Jack Ham in Procuring a Construction Loan.

Respondent determined that petitioners received income in 1978 of $38,334.50, consisting of a $15,000 finder's fee for assisting Jack Ham in procuring a construction loan and a $23,334.50 fee for assisting Jack Ham in procuring a liquor license. Petitioner asserts that he never had any agreement with, nor did he receive any fees from the Hams during the taxable year in issue. Petitioner admits that he received $38,334.50 in 1978, but asserts that such income was from the sale of his partnership interest in South Texas Drilling. Petitioner concedes that although the transaction was inadvertently omitted from his original 1978 joint Federal income tax return, the sale was properly reported on a timely filed amended return.

Based on the entire record and for the reasons discussed herein, we find that Jack Ham paid petitioner a $15,000 finder's fee for petitioner's assistance in procuring a $2.5 million construction loan for the Hams.

Gross income includes all income from "whatever source derived". Sec. 61(a). The Supreme Court has consistently held that section 61 subjects to taxation all accessions to wealth that are clearly realized over which a taxpayer has complete dominion and control, unless specifically excluded by statute. Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). Moreover, the elimination of a taxpayer's debt, in whole or in part, may result in an accession to wealth. Sec. 1.61-12(a), Income Tax Regs.

Respondent introduced the following evidence that petitioner received a $15,000 finder's fee from Jack Ham: During a deposition taken before petitioner's criminal trial, Jack Ham testified that he owed petitioner a finder's fee because petitioner helped him obtain a $2.5 million construction loan. Moreover, Bert Ham testified at trial of this case that he and Hood both knew that Jack Ham owed petitioner a finder's fee. In fact, sometime prior to August 1978, the Hams met with Hood at the Capitol in order to discuss the progress of the construction loan. During that meeting, Hood telephoned petitioner about the loan, who indicated that he would call Nelson, the president of Commerce Bank regarding the matter. Furthermore, petitioner conceded at trial that he indeed contacted Nelson in an effort to help the Hams get financing. Shortly after speaking with Nelson, the Hams received the $2.5 million loan. Bert Ham further

testified that on December 4, 1978, he gave Commerce Bank a check for $15,000 on behalf of his uncle, as reimbursement for the finder's fee that Jack Ham owed petitioner. Finally, Nelson, the bank's president, testified that the $15,000 payment was used to partially extinguish the oil partnership debt that petitioner had outstanding with the bank.

Seeking to rebut respondent's evidence, petitioner contends that although he called Commerce Bank, he did not indicate to Nelson that he had a personal financial interest in the loan's being approved, nor did the bank deviate from its policies in extending credit to Ham. Even if true, these facts do not negate a finding that petitioner received a $15,000 finder's fee. It is irrelevant whether petitioner in fact influenced the bank's decision to extend credit to the Hams. What is relevant is Jack Ham's perception of the events that led up to the bank's approval of the loan and his own obligation to pay. Because of the Hams' difficulty with Commerce Bank in the past, Jack Ham was convinced that the bank approved the loan solely because of petitioner's assistance.

To support his contention that he and Jack Ham never had an agreement, petitioner points to the lack of "anything in writing evidencing indebtedness between petitioner and [Ham] relating to a finder's fee". Although the $15,000 debt might have been unenforceable had Jack Ham refused to pay it, he did in fact pay

it.  Jack Ham clearly compensated petitioner for his efforts when, through his nephew, he paid Commerce Bank $15,000 to partially extinguish petitioner's outstanding debt.  Moreover, at trial Bert Ham testified that he paid petitioner the 15,000 as a finder's fee on behalf of his uncle, who owed petitioner the money.

We hold that petitioner received a $15,000 finder's fee in 1978.

Issue 2. Whether Petitioner Is Liable for the Section 6653(b) Fraud Addition to Tax

Under section 6653(b) respondent has the burden of proving by clear and convincing evidence that there is an underpayment of tax and that some part of the underpayment was due to fraud.  See sec. 7454(a); Rule 142(b).  Respondent must show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes.  Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

In the instant case, petitioner has already been collaterally estopped from denying that he received $23,334.50 from Jack Ham in violation of the Hobbs Act.  Moreover, as discussed, supra pp.12-15, we found that petitioner received a $15,000 finder's fee in 1978 from Jack Ham for assisting him in procuring the $2.5 million construction loan through Commerce Bank.  Finally, petitioner's amended return admits receipt of the

$38,334.50 that resulted in the underpayment.  Accordingly, pursuant to section 6653(b), respondent has proven that an underpayment of tax exists for the year in issue.  We now must decide whether petitioner intended to conceal, mislead, or otherwise prevent the collection of such taxes.  Rowlee v. Commissioner, supra at 1123, and cases cited therein.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud will never be presumed.  Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  Fraud may, however, be proved by circumstantial evidence, because direct proof of the taxpayer's intent is rarely available. Rowlee v. Commissioner, supra.  The taxpayer's entire course of conduct may establish the requisite fraudulent intent.  Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).  The intent to conceal or mislead may be inferred from a pattern of conduct.  See Spies v. United States, 317 U.S. 492, 499 (1943).  Over the years, this Court has developed a nonexclusive list of the various kinds of circumstantial evidence that may support a finding of fraud.  See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992) (citing Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601).

Purposefully engaging in sham transactions with the intent to disguise ordinary income as capital gains is strong evidence of fraud. See Fazzio v. Commissioner, 959 F.2d 630 (6th Cir. 1992), affg. T.C. Memo. 1990-608. Based on collateral estoppel,[9] petitioner's receipt of the $23,334.50 was not for the sale of the oil partnership interest. Instead, when Jack Ham paid Commerce Bank $23,334.50 in satisfaction of petitioner's outstanding debt at the bank, and subsequently acquired petitioner's interest in the oil partnership, this amount was paid by Ham and understood by petitioner to be in satisfaction of an obligation to pay petitioner 20 percent of the profits from Ham's liquor store and for no other purpose. See Blanton v. Commissioner, 94 T.C. 491, 498 (1990). The same is true with respect to the $15,000 finder's fee; i.e., it was not paid for the partnership interest.

Petitioner and Jack Ham, with the assistance of Hood, initiated detailed transactions with Commerce Bank to ensure that the sham sale appeared bona fide despite the oil partnership's lack of value. It is clear that petitioner's interest in the oil partnership was worthless or nearly so. Both Jack and Bert Ham believed that it had no value. In fact, after acquiring the

---

[9]    As discussed supra note 3, petitioner is collaterally estopped from denying that in 1978 he received income of $23,334.50 from liquor license sales in violation of the Hobbs Act.

interest from petitioner, Jack Ham sold it to his nephew for $334.50 and claimed a loss for tax purposes. At trial, Harris, a commercial loan officer at Commerce Bank, testified that after considering petitioner's interest expense, he thought petitioner's oil partnership interest was worth a negative amount. Hooker, who was a limited partner himself, testified that he thought the price petitioner received was high in relation to the value. Moreover, all the original investors in the oil partnership lost money because the oil production drastically dropped, and investors could not find buyers to whom they could sell their interests. Finally, petitioner admitted to IRS Agent McGehee that he thought he would lose his entire investment because the well was dry. Thus, by structuring a transaction where he would receive $38,334.50 for an oil partnership interest that was worth little or nothing, petitioner purposefully intended to conceal his receipt of the kickbacks.

We note that petitioner's education and sophistication are also relevant to the determination of fraud. See Blunt v. Commissioner, T.C. Memo. 1966-280 (fraud addition imposed on former mayor whose activity in business and civic affairs gave him the requisite sophistication to commit fraud); see also Halle v. Commissioner, 175 F.2d 500, 503 (2d Cir. 1949), affg. 7 T.C. 245 (1946). Petitioner was a career politician. During his career, he held office as a State legislator and U.S.

Congressman.  Winning eleven of thirteen campaigns for office, his political career culminated in his election to the highest political office in the State.  As Governor, petitioner was responsible for running the State and supervising 38,000 employees.  Petitioner cannot claim ignorance with respect to the value of the oil partnership.  Petitioner was a sophisticated investor who knew, and even admitted, that he made a bad investment.

Finally, the following factors are indicative of petitioner's fraudulent intent: (1) Petitioner's substantial understatement of income coupled with circumstances showing an intent to conceal; see Holland v. United States, 348 U.S. 121 (1954); (2) petitioner's involvement in illegal activities and his attempts to conceal those illegal activities; see Bradford v. Commissioner, supra; (3) petitioner's act of filing false documents and failing to comply with known reporting requirements; see Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984); and (4) petitioner's making false and misleading statements to respondent's agents; see Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980).

In light of the foregoing, we find that respondent has proven by clear and convincing evidence that petitioner engaged in conduct intended to conceal, mislead, or otherwise prevent the collection of his 1978 taxes.  Petitioner fraudulently reported

the disposition of his interest in South Texas Drilling as a sale in order to disguise the $38,334.50 of ordinary income received.[10]

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[10]    Based on our finding that petitioner fraudulently underreported his income for 1978, respondent is not barred by the section 6501(a) limitations period from assessing a deficiency against petitioner for the taxable year in issue.